# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 15, 2009          Decided July 13, 2010

No. 08-1293

AIR TRANSPORT ASSOCIATION OF AMERICA, INC.,
PETITIONER

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION AND
FEDERAL AVIATION ADMINISTRATION,
RESPONDENTS

AIRPORTS COUNCIL INTERNATIONAL – NORTH AMERICA,
INTERVENOR

———

On Petition for Review of an Order
of the Department of Transportation
and the Federal Aviation Administration

———

*Robert S. Span* argued the cause and filed the briefs for
petitioner.

*Peter R. Maier*, Attorney, U.S. Department of Justice,
argued the cause for respondents. With him on the brief were
*Michael Jay Singer*, Attorney, *Paul M. Geier*, Assistant
General Counsel for Litigation, U.S. Department of
Transportation, and *Mary F. Withum*, Trial Attorney. *Lewis*

*Yelin*, Attorney, U.S. Department of Justice, entered an appearance.

*Scott P. Lewis* argued the cause for intervenor. With him on the brief was *Douglas H. Wilkins*.

Before: GINSBURG and HENDERSON, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GINSBURG.

I. Background.......................................................................... 3
    A. The Problem of Congestion ....................................... 3
        1. Excess Demand.................................................... 4
        2. Possible Solutions............................................... 5
    B. Regulation of Landing Fees....................................... 6
        1. Statutory Requirements ...................................... 7
        2. The 2008 Amendments....................................... 8
II. Analysis........................................................................... 12
    A. Unreasonable and Discriminatory Fees................... 13
        1. The Standard of Review ................................... 13
        2. Reasonableness................................................. 15
        3. Unjust Discrimination....................................... 16
    B. Preemption................................................................ 18
    C. Guidance to Airports ............................................... 22
    D. Change of Policy ..................................................... 24
III. Conclusion .................................................................... 27

GINSBURG, *Circuit Judge*: In order to reduce congestion at major airports the Department of Transportation in 2008 amended its 1996 Policy Regarding Airport Rates and Charges. The Amendments allow an airport to charge aircraft higher landing fees at peak times, a practice known as congestion pricing. The Air Transport Association of America (ATA), on behalf of U.S. scheduled airlines,

petitions for review of the Amendments, arguing they (1) allow airports to charge unreasonable and discriminatory fees, (2) allow state and local airport authorities to charge fees that are preempted by federal law, (3) provide inadequate guidance to airports on how the DOT will evaluate the reasonableness of the fees, and (4) constitute an unexplained reversal of prior policy. Airports Council International (ACI), which represents governmental bodies that own and operate major airports in the U.S., including 36 of the 37 airports the DOT deems "currently congested," has intervened in support of the DOT. We deny the petition for review.

## I. Background

As the primary manager of the Nation's air transportation system, the DOT determines whether the fees an airport charges its users comply with the various federal statutes requiring that the fees be reasonable. The Secretary of Transportation is required by statute to publish regulations "establishing ... the standards or guidelines" he will use to evaluate the reasonableness of an airport's fees. 49 U.S.C. § 47129(b)(2). This case involves a challenge to one set of regulations promulgated under that statute.

A. The Problem of Congestion

In the 12 years between the promulgation of the 1996 Policy and of the 2008 Amendments, the number of landings by airlines in the United States increased more than 25%, to 10.3 million from 8.2 million per year. *See* Bureau of Transportation Statistics, *National Transportation Statistics*, Table 1-34 (April 2010).[*] This increase in traffic has led to

---

[*] These data are for departures rather than arrivals, but for present purposes the terms are interchangeable because what goes

more frequent and longer delays; in 2007, for instance, "flight arrivals were delayed by a total of 4.3 million hours." U.S. Congress Joint Economic Committee, Report, *Your Flight Has Been Delayed Again: Flight Delays Cost Passengers, Airlines, and the U.S. Economy Billions* 1 (May 22, 2008). The causes for delay range from inclement weather to mechanical problems; this case involves delays caused by excess demand for airport takeoff and landing capacity.

### 1. Excess Demand

Excess demand arises when demand for a good or service at the prevailing price exceeds the supply, which results in would-be buyers having to queue. In the air transportation system, the buyers are airlines, the service is allowing an aircraft to land at a particular airport, and the price is the landing fee the airport charges the airline for landing. The delays in landing are manifestations of there being a queue.

In an ordinary market, supply and price adjust to eliminate excess demand, but this is no ordinary market. Airports cannot readily increase the supply of landing slots because building more runways takes years and at some airports is not feasible at all. *See* Policy Regarding Airport Rates and Charges, 73 Fed. Reg. 3310, 3312/3 (proposed Jan. 17, 2008). Nor may airports freely increase the price as demand increases; the amount an airport may charge as a landing fee is constrained by the oversight of the DOT and by several federal statutory restrictions.

---

up must come down, *see generally* Isaac Newton, *Philosophiæ Naturalis Principia Mathematica* (1687), and airplanes almost always come down at an airport.

Adding to the difficulty of managing congestion, the volume of air traffic varies significantly both throughout the day and from one airport to another. Not all airports suffer from significant congestion, even at the most desirable times (or "rush hours"). Addressing this variation in the demand for landings requires giving airports some flexibility in rate-setting.

### 2. Possible Solutions

There are two ways in which an airport might increase its landing fee to the market-clearing level — that is, to the price just high enough to eliminate the excess demand and hence the queue at peak times. The first is to sell at auction the right to land an aircraft at a particular airport at a particular time; that right is called a "landing slot." In an auction an airport would first determine the number of landings it can accommodate during a given period of time, such as an hour, and then allow airlines to bid for each slot in an auction; the winning bid would determine the price of the landing slot. The alternative is "congestion pricing," which entails the airport itself increasing the price (landing fee) until it elicits demand for only as many landings as it can accommodate, thereby eliminating queuing and delay. Both a slot auction and congestion pricing will converge upon the same price and the same quantity.

In principle neither system is preferable to the other. *See* Martin L. Weitzman, *Prices vs. Quantities*, 41 Rev. Econ. Stud. 477 (1974). Many commentators, however, have advocated slot auctions rather than congestion pricing because an airport operator knows how many landings the airport can safely accommodate per hour but can learn only by trial and error what fee will yield that many landings. *See, e.g.*, S.J. Rassenti *et al.*, *A Combinatorial Auction Mechanism*

*for Airport Time Slot Allocation*, 13 Bell J. Econ. 402 (1982); D. Grether *et al.*, *The Allocation of Landing Rights by Unanimity Among Competitors*, 71 Am. Econ. Rev. 170, 170–71 (1981). *But see* Michael E. Levine, *Landing Fees and the Airport Congestion Problem*, 12 J.L. & Econ. 79 (1969) (proposing a system of congestion pricing). The regulations under review represent the DOT's attempt to implement a system of congestion pricing.[*]

B. Regulation of Landing Fees

As the air transportation system has become increasingly congested, the Department of Transportation's task of managing the system has become increasingly difficult. The Department has tried to solve the problem of congestion using its statutory authority to supervise the fees an airport charges its users, including the landing fees paid by airlines.

---

[*] The DOT previously tried to use slot auctions to manage congestion. In 2008 it promulgated rules requiring slot auctions for the three major airports serving New York City. *See* Congestion Management Rule for LaGuardia Airport, 73 Fed. Reg. 60,574 (Oct. 10, 2008); Congestion Management Rule for John F. Kennedy International Airport and Newark Liberty International Airport, 73 Fed. Reg. 60,544 (Oct. 10, 2008). We stayed those rules pending our resolution of petitions for review challenging the DOT's authority to require a system of slot auctions. *See* Dec. 8, 2008 Order, *Port Authority of N.Y. & N.J. v. FAA*, No. 08-1329. While that case was being held in abeyance and after the DOT had promulgated the 2008 Amendments here under review, the DOT rescinded the slot auction regulations. *See* 74 Fed. Reg. 52,134 (Oct. 9, 2009); 74 Fed. Reg. 52,132 (Oct. 9, 2009).

### 1. Statutory Requirements

The Airports and Airways Improvements Act requires that airports "be available for public use on reasonable conditions and without unjust discrimination." 49 U.S.C. § 47107(a)(1).[*] We have interpreted that obligation as "a requirement that [an] airport's fees be reasonable." *Air Transp. Ass'n of Am. v. DOT*, 119 F.3d 38, 39 (1997) (*ATA I*) (citing *New England Legal Found. v. Mass. Port Auth.*, 883 F.2d 157, 169–70 (1st Cir. 1989)). The Anti-Head Tax Act also requires that the fees be reasonable. *See* 49 U.S.C. § 40116(e). The Federal Aviation Administration Authorization Act requires the Secretary of Transportation to publish regulations, such as the ones here under review, "establishing ... the standards or guidelines that [he will use] in determining ... whether an airport fee is reasonable." 49 U.S.C. § 47129(b)(2).

Airports currently operate under the DOT's 1996 Policy Regarding Airport Rates and Charges, 61 Fed. Reg. 31,994 (June 21, 1996), *vacated in part by ATA I*, 119 F.3d 38, *as amended at* 129 F.3d 625 (D.C. Cir. 1997), which, as we have noted before, provides airports with precious little guidance, *see ATA I*, 119 F.3d at 41 (the "'guideline' seems to be missing a 'line'"). As a result, airlines and airport proprietors regularly ask the DOT whether a particular landing fee is

---

[*] In order to receive an airport improvement project grant, an airport must give the Secretary of Transportation "written assurances" that it "will be available for public use on reasonable conditions and without unjust discrimination." 49 U.S.C. § 47107(a). This condition is in effect everywhere because "[a]ll commercial service airports operating in the United States ... have accepted [the] grants." Policy Regarding Airport Rates and Charges, 73 Fed. Reg. 40,430, 40,431/1 (July 14, 2008).

reasonable, *see* 49 U.S.C. § 47129, and seek judicial review of its decision in this court. *See, e.g.*, *Alaska Airlines, Inc. v. DOT*, 575 F.3d 750 (2009); *Port Auth. of N.Y. & N.J. v. DOT*, 479 F.3d 21 (2007); *City of Los Angeles v. DOT*, 165 F.3d 972 (1999); *Air Canada v. DOT*, 148 F.3d 1142 (1998); *City of Los Angeles v. DOT*, 103 F.3d 1027 (1997).

### 2. The 2008 Amendments

The DOT finally sought to update its regulations regarding landing fees in 2008, more than a decade after we had vacated much of the 1996 Policy. Rather than address the various problems we identified with the original policy, however, the Department promulgated Amendments to the 1996 Policy solely in order to implement a system of congestion pricing. This the Amendments do by allowing an airport to: (1) add to its rate base certain previously excluded costs, which enables it to increase the landing fees it charges; (2) alter the structure of those fees so as to encourage airlines to use a more efficient mix of large and small aircraft at congested airports; and (3) charge higher fees during peak periods. *See* Policy Regarding Airport Rates and Charges, 73 Fed. Reg. 40,430 (July 14, 2008).

*Increasing the price.* If an airport wants to reduce congestion then it must eliminate the excess demand by reducing the number of planes that airlines want to land during peak periods. In order to do so, it must have some method of allocating the scarce resource of the opportunity to land. Congestion pricing accomplishes this by increasing the price. If the fee is high enough, then an airline will adjust its schedule by shifting a flight to a less congested time or an alternate airport, using fewer but larger aircraft, or simply canceling some flights.

An airport may not freely increase its prices, however, because of its public service obligation to charge only reasonable fees. The DOT enforces that obligation by limiting the total airfield fees an airport may collect, including landing fees. This limit is based upon the historical costs the airport is allowed to include in its "rate base." In order to increase the allowable landing fee, therefore, an airport must somehow increase its rate base.

The Amendments allow an airport to do just that. In certain circumstances an airport may now for the first time include in its rate base certain costs, *viz.*, "a portion of the costs of an airfield project under construction" and the "costs associated with another [commonly-owned] airport." The 1996 Policy allowed an airport to include the latter costs only if "the costs of the other airport to be included in the first airport's rate base are reasonably related to the aviation benefits that the other airport provides or is expected to provide to the aeronautical users of the first airport." 61 Fed. Reg. at 32,020/3. That condition was, however, "presumed to be satisfied if the other airport [was] designated as a reliever airport for the first airport [by] the FAA[]." *Id.* A reliever airport is an alternative to a primary airport for general aviation, *see* Federal Aviation Administration, *2009–2013 National Plan of Integrated Airport Systems* at 28 (2008); Van Nuys Airport in Los Angeles, California, for example, is a reliever airport for Los Angeles International Airport (LAX), *see id.* at App'x A-22. Under the Amendments, that condition will also be presumed satisfied if "the other airport has been designated by the FAA as a secondary airport." 73 Fed. Reg. at 40,445/2. A secondary airport is an alternative to a primary airport for commercial and general aviation, *see 2009–2013 National Plan* at 28; LA/Ontario International Airport in Ontario, California is a secondary airport for LAX, *see* Appendix to Notice, Docket No. FAA-2008-0036-0007.1

(Jan. 23, 2008).  Allowing an airport to include the costs of facilities under construction and of secondary airports in its rate base enables the airport to raise the landing fee it charges.

*Price Structure*.  Increasing the landing fee will decrease the number of flights landing at an airport, but the DOT also has an interest in ensuring airports accommodate the flying public.  Currently an airport may base its landing fees only upon the weight of the aircraft, which usually gives the airline little or no incentive to schedule fewer flights with more passengers on each.  For example, at Chicago O'Hare International Airport the fee to land a Boeing 757-200, a mid-size jet that seats about 200 passengers, is $520, or about $2.60 per passenger; landing a Canadair CRJ200, a regional jet that seats about 50 passengers, costs $120, or about $2.40 per passenger.  *See* Katherine Ashley & Ian Savage, *Pricing Congestion for Arriving Flights at Chicago O'Hare Airport*, 12 J. Air Transp. Mgmt. 36, 40 (2010).  *E.g.*, the 20-cent difference in price per person per flight is unlikely to alter the choice of aircraft.

Each flight, regardless of the number of passengers on board, imposes a cost upon all the other airlines serving the same airport and upon their passengers.  The DOT wants to reduce congestion but also wants to accommodate as many passengers as possible consistent with reduced congestion.  The Amendments, therefore, provide an incentive for airlines to offer fewer flights with more seats per aircraft, a practice called "upgauging."

This they do by authorizing an airport to institute "a two-part landing fee consisting of a combination of a per-operation charge and a weight-based charge."  73 Fed. Reg. at 40,444–45.  The per-operation (*i.e.*, per landing) charge is fixed because the number of landings an airport can

accommodate in a given time does not vary greatly. The weight-based charge is variable, reflecting that "marginal airport costs do tend to vary with aircraft weight." Steven A. Morrison, *The Structure of Landing Fees at Uncongested Airports: An Application of Ramsey Pricing*, 16 J. Transport Econ. & Pol'y 151, 151 (1982); *see* A.A. Walters, *Airports— An Economic Survey*, 12 J. Transport Econ. & Pol'y 125, 133 (1978).

*Varying the Price.* Finally, the Amendments allow an airport to use these new pricing techniques only during peak periods because there is no reason to alter the incentives facing off-peak users. This concept is not unfamiliar to airlines; prices for flights frequently vary depending upon the time of day, in line with the variation in demand. The practice is common in other industries, as well. For example, mobile phone plans typically allot a different number of minutes for calls at peak versus off-peak times.

The Amendments encourage higher peak pricing only indirectly: During peak times, they allow an airport (1) to include the costs of secondary airports and unfinished projects, and hence to charge a higher price; and (2) to impose the two-part fee, including the per-operation charge. During other times, the airport will use the existing rate base and weight-based fee structure, resulting in lower fees at off-peak times. Specifically, the Amendments allow an airport to include in its rate base the costs of projects under construction and of a secondary airport only if doing so "during congested hours would have the effect of reducing or preventing congestion and operating delays at [the primary] airport in those hours." 73 Fed. Reg. at 40,444–45. Similarly, the Amendments allow an airport to implement the two-part charge only if doing so "reasonably allocates costs to users on

a rational and economically justified basis."  The Department gives the following example:

> The proportionately higher costs per passenger for aircraft with fewer seats that will result from the per-operation component of a two-part fee may be justified by the effect of the fee on congestion and operating delays and the total number of passengers accommodated during congested hours.[*]

73 Fed. Reg. at 40,445.

These three changes — allowing an airport to include certain costs in the rate base for determining landing fees during congested hours, instituting the two-part fee structure, and permitting landing fees to vary throughout the day — are the basic elements of the DOT's plan to decrease congestion. The ATA argues that each one is facially inconsistent with one or more statutes.

## II. Analysis

The ATA makes four principal arguments.  (1) The Amendments authorize airports to charge unreasonable and unjustly discriminatory landing fees, in violation of the Airports and Airways Improvement Act of 1982, 49 U.S.C. § 47107(a)(1), and the Anti-Head Tax Act, 49 U.S.C. § 40116(e)(2); (2) those fees are state or local governmental regulations preempted by the Airline Deregulation Act of 1978, 49 U.S.C. § 41713(b)(1); (3) the DOT failed to meet its

---

[*] "A congested hour is an hour during which demand exceeds average runway capacity resulting in volume-related delays, or is anticipated to do so" — in other words, an hour during which there is excess demand.  73 Fed. Reg. at 40,445/3.

obligation under § 113 of the Aviation Administration Authorization Act of 1994, 49 U.S.C. § 47129, to provide guidance to airports; and (4) the Amendments are arbitrary and capricious because they are unexplained departures from prior policies. We find each argument unpersuasive for the reasons that follow.

A. Unreasonable and Discriminatory Fees

An airport may not charge a fee that is unreasonable or unjustly discriminatory. *See* 49 U.S.C. § 40116(e)(2) (airport may collect only "reasonable ... landing fees"); 49 U.S.C. § 47107(a)(1) (airport must "be available for public use on reasonable conditions and without unjust discrimination"). The ATA argues that (1) including the costs of future facilities and of secondary airports in the rate base and (2) charging a two-part landing fee comprising a weight-based charge and a per-operation charge are each independently both unreasonable and unjustly discriminatory.

1. The Standard of Review

The ATA brings only a facial challenge to the Amendments, presumably because, as the parties related at oral argument, no airport has implemented the system of congestion pricing allowed by the Amendments. To prevail in a facial challenge, the ATA "must establish that no set of circumstances exists under which the [Amendments] would be valid." *Reno v. Flores*, 507 U.S. 292, 301 (1993) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). Therefore, to make its point that the DOT lacked authority to promulgate the Amendments, it is not enough to show there is a "mere possibility" an airport might apply the Amendments in such a way as to set an unlawful fee. *Bldg. & Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002).

14

Pursuant to *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), we give "substantial deference" to the DOT's interpretation of a statute that requires it to ensure fees are reasonable but "does not set standards for assessing reasonableness" because the Secretary of Transportation, not the court, "is charged with administering the federal aviation laws." *Northwest Airlines, Inc. v. County of Kent*, 510 U.S. 355, 366–67 (1994) (citing *Chevron*, 467 U.S. at 842–845). The ATA would have us apply the specific standard used in *Northwest*, 510 U.S. at 369, which was based upon that in *Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines*, 405 U.S. 707, 716–17 (1972): A fee "is reasonable ... if it (1) is based on some fair approximation of use of the facilities, (2) is not excessive in relation to the benefits conferred, and (3) does not discriminate against interstate commerce." As the DOT points out, however, the Court in *Northwest* was evaluating a particular set of fees imposed by a single airport — before passage of the statute that requires the Secretary to establish "the standards or guidelines [he will use] in determining ... whether an airport fee is reasonable," Pub. L. No. 103-305, 108 Stat. 1569 § 113, 49 U.S.C. § 47129(b). The Court explained that because it "[l]ack[ed] guidance from the Secretary [of Transportation]" regarding how to evaluate the reasonableness of those fees, it had to "look elsewhere" for a standard. *Northwest*, 510 U.S. at 367. The Court expressly noted that when the Secretary creates a standard, as he has here, "for determining whether fees are 'reasonable' ... his exposition will merit judicial approbation so long as it represents 'a permissible construction of the statute.'" *Id.* at 368 n.14 (quoting *Chevron*, 467 U.S. at 842–45). For the same reasons, we defer to the DOT's reasonable interpretation of the statutory prohibition of unjust discrimination.

### 2. Reasonableness

An aircraft that lands at a congested time imposes a significant cost, in the form of delay, both upon other airlines that want to land aircraft at the same time and upon the passengers aboard those aircraft. Each additional aircraft seeking to land at that time adds to the congestion and imposes additional delays upon other users of the system. Meanwhile, the airline that successfully lands an aircraft at the peak time reaps a substantial benefit because it is able to offer a valuable service to its customers. As long as the costs to the airline landing the aircraft during a peak hour are less than the benefits to that airline, it will land the aircraft even if the total social costs — including delays to other users of the system — exceed the total social benefits. *See* Garrett Hardin, *The Tragedy of the Commons*, 162 Science 1243 (1968).

The ATA argues the fees authorized by the Amendments necessarily will be unreasonable because the Amendments do not comply with the principle, common in rate regulation, "that an asset must be 'used and useful' before it can be included in the rate base" of a regulated utility. *Mid-Tex Elec. Coop. v. FERC*, 773 F.2d 327, 332 (D.C. Cir. 1985) (citing *Smyth v. Ames*, 169 U.S. 466 (1898)). Neither an airport nor the DOT, however, is required to adhere to that principle. As the DOT argues, the relevant statutes require only reasonable and non-discriminatory fees, not fees based upon a particular form of cost recovery. We have explained elsewhere that the "used and useful" principle is "simply one of several permissible tools of ratemaking, one that need not be, and is not, employed in every instance." *Jersey Cent. Power & Light Co. v. FERC*, 810 F.2d 1168, 1175 (D.C. Cir. 1987) (en banc). Accordingly, an agency may "depart from the 'used and useful' standard" in order to pursue another

legitimate objective. *Wash. Gas Light Co. v. Baker*, 188 F.2d 11, 20 (D.C. Cir. 1951); *see Mid-Tex*, 773 F.2d at 346 (holding it reasonable, and consistent with the principle of "used and useful," to include in the rate base certain funds for unfinished projects). We focus our inquiry not upon each asset included in the rate base, but rather upon whether the end result is reasonable. *See Jersey*, 810 F.2d at 1177–78; *see also Fed. Power Comm'n v. Hope Nat. Gas Co.*, 320 U.S. 591, 603 (1944) ("end result" test for whether rates are just and reasonable).

It is entirely reasonable to expect an airline, and in turn its passengers, to pay a premium for the opportunity to arrive at a peak time. If an airport is able to reduce congestion by using the two-part scheme and including in its rate base the costs of a future facility or of a secondary airport then, without more, it is impossible to say its increased landing fee must be unreasonable. The increased fee will drive other aircraft away — whether in time or in space — and thereby will benefit the airline that pays the fee to land at a peak time. Depending upon the actual amount of the fee, therefore, it may well be reasonable.

### 3. Unjust Discrimination

The ATA complains in various ways the Amendments will require an airline to subsidize its competitor, as though a cross-subsidy necessarily implies "unjust discrimination." 49 U.S.C. § 47107(a)(1). The variation in the fees permitted by the Amendments need not be unjustly discriminatory, however. Each aircraft that lands at a particular airport during a particular hour will be subject to the same fee, adjusted only, as it is now, for weight. Although landing fees will vary from one airport to another and from one hour to another, the DOT has adequately justified such differences

based upon variations in the degree of congestion at different airports and different times.

First, the ATA complains that to include in an airport's rate base the costs of (1) a different but commonly owned airport or (2) an unfinished project is to force that airline to subsidize its competitors. The ATA's objection is implicitly based upon the principle that the total fees collected by an airport may not exceed the total costs incurred by the airport: If a primary airport includes in its rate base the cost of a secondary airport, then it must reduce its rate base in the second airport by an equal amount; similarly, if it includes the cost of a project under construction, then it may not recover the same costs again upon completion of the project. *See* 73 Fed. Reg. at 40,445/1–2. In each case the actual users of the facilities newly included in the rate base will pay lower fees than they would otherwise do. In other words, if the fees at one airport go up, then the fees at another must come down, and that is a "subsidy" for users of the secondary airport, including airlines that compete with the airlines that use the primary airport; likewise, the objection goes, present users paying for facilities to be used by future users "subsidize them."

The effect of the pricing scheme may look like a subsidy but it does not necessarily work an unjust discrimination, regardless whether all components of the rate base are actually used by the airlines that pay the landing fees, because off-peak users are not responsible for the costs of the present congestion or of any future expansion necessitated thereby. In an industry with high fixed costs it is not unreasonable or unjust for peak load users to pay more than off-peak users because the peak price is being used to allocate a scarce resource. *See* 1 Alfred E. Kahn, *The Economics of Regulation: Principles and Institutions* 89 (1970) ("The off-

peak users impose no such costs on society. ... The necessity for expansion is imposed by the customers at the peak hours.").

The ATA also argues a two-part fee will more adversely affect "airlines with a business model dependent on the use of certain size aircraft flying at certain times of day or with certain frequencies." That is true, of course. An airline that lands a small aircraft at a peak time, however, imposes nearly as much cost upon the other users of the airport as does an airline that lands a larger aircraft. A landing fee increased to reflect that fact might make it unprofitable for the former airline to leave its present schedule and fleet unchanged, but that is the point of peak-load pricing, not a defect that makes the price differential unjustly discriminatory.

We cannot, of course, rule out the possibility that an airport will implement a system of fees that complies with the Amendments but is nonetheless unreasonable or unjustly discriminatory. Because an airport can also implement the Amendments in a way that is reasonable and not unjustly discriminatory, however, the ATA's facial challenge must fail.

B. Preemption

In another facial attack the ATA argues the DOT lacked authority to promulgate the Amendments because the Airline Deregulation Act of 1978 preempts and thus prohibits any state or local airport authority's attempt to implement congestion pricing. The ADA provides a state or local authority "may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier." 49 U.S.C. § 41713(b)(1). This clause limits what most airports can do because most airports are operated by a local authority. *See* Tae H. Oum,

Nicole Adler, & Chunyan Yu, *Privatization, Corporatization, Ownership Forms and their Effects on the Performance of the World's Major Airports*, 12 J. Air Transp. Mgmt. 109, 109 & n.1 (2006).

The ATA argues "an airport proprietor necessarily would violate the ADA by establishing congestion landing fees" because varying fees based upon the time of day "for the purpose of influencing airline service decisions" is a measure "related to a price, [etc.], ... of an air carrier." Surely, however, an airport may charge some fee authorized by the Amendments without violating the ADA.[*]

First, as the DOT points out, a state or local authority that owns or operates an airport is expressly authorized by the Anti-Head Tax Act to charge a reasonable landing fee. *See* 49 U.S.C. § 40116(e) ("a State or political subdivision of a State may levy or collect ... reasonable ... landing fees"). Second, nothing in the ADA prohibits an airport from charging a reasonable landing fee pursuant to the just-cited authority; on the contrary, the very preemption section of the ADA upon which the ATA bases its argument contains an exception allowing an airport authority, notwithstanding other provisions of the Act, to "carry[] out its proprietary powers and rights." 49 U.S.C. § 41713(b)(3). Because some fees authorized by the Amendments may be reasonable, it is within an airport's "proprietary powers and rights" to charge those fees. The facial challenge therefore fails because the ATA must, but cannot, "establish that no set of circumstances

---

[*] Because we hold charging a reasonable landing fee is within an airport's proprietary powers and therefore is not prohibited by the ADA, we need not address the ACI's alternative argument that such a fee is not "related to a price, route, or service of an air carrier." 49 U.S.C. § 41713(b)(1).

exists under which the [Amendments] would be valid." *Reno*, 507 U.S. at 301 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

The ATA raises three other arguments related to the ADA. First, citing *Rowe v. New Hampshire Motor Transport Ass'n*, 552 U.S. 364, 373 (2008), it argues the Amendments will create precisely the "patchwork of local regulation of air service" the Congress intended the ADA to prevent. This is a problem, it claims, because "[a]irlines' schedule, staffing, and equipment decisions are made based on a complicated and comprehensive view of a nationwide or even global network." The differences among the patches at issue, however, are differences in price only and take the form of state and local regulations only because state and local authorities operate most airports.

We recognize, of course, that prices alter behavior — that is the premise upon which the Amendments are based — and understand prices that vary from place to place will yield incentives that vary as well. Neither the ADA nor any other statute concerning air traffic, however, demands uniform prices or uniform incentives. The statute that allows airport authorities to collect fees expressly forbids some types of levies, *e.g.*, a "head charge," but it allows all others so long as they are reasonable. *See* 49 U.S.C. §§ 40116(b), (e). Another statute compels the DOT to evaluate whether a fee imposed upon an airline is reasonable but expressly forbids the Department from "set[ting] the level of the fee." 49 U.S.C. § 47129(a)(3). That necessarily means state and local authorities will "set the level of the fee[s]" and they will not be uniform. *Id.*

In sum, although the ADA forbids states and local authorities from directly regulating air traffic, the structure

the Congress created virtually ensures, and surely accepts, that fees will vary across airports. The resulting differences in incentives are unavoidable, not unlawful.

Indeed, the ATA does not claim the landing fees now being charged are uniform, nor could they be because the historical costs upon which they are based vary from airport to airport. Moreover, airlines already operate subject to constraints that vary among airports, including differences in fuel prices, operating hours and, of course, the degree of congestion. *See* John S. Stroup & Richard D. Wollmer, *A Fuel Management Model for the Airline Industry*, 40 Operations Res. 229 (1992) (describing the practice of "tankering" fuel between airports because of cost differences); Metropolitan Washington Airports Authority Regulations § 3.11 (setting curfew for airline operations at only one of three area airports); Scott McCartney, *Why a Six-Hour Flight Now Takes Seven*, Wall St. J., Feb. 4, 2010, at D1 (explaining schedule padding in response to congestion). We think it obvious the Congress also anticipated non-uniform landing fees and the non-uniform incentives they produce.

Second, the ATA argues that under the ADA the incentives created by non-uniform landing fees should be permitted only if the differences are incidental rather than intentional. The ATA points to nothing in the ADA, however, that suggests the intent of an airport authority in setting rates is at all relevant to the lawfulness of those rates. So long as a state or local measure is "related to a price, route, or service of an air carrier," it is forbidden unless it comes within the exception for proprietary powers. And, as we already have said, setting landing fees that comply with all applicable statutes and regulations is within the scope of an airport authority's power as proprietor.

Finally, the ATA argues the First Circuit has already rejected the type of two-part fee structure at issue here. *See New England Legal Found. v. Mass. Port Auth.*, 883 F.2d 157 (1989). In that case, however, the airport had adopted a fee structure without authorization from the DOT; the Secretary rejected only that particular fee structure – not the concept of a two-part tariff — because it was "not scientifically derived" and therefore not reasonable and not saved by the exception for proprietary powers. *Id.* at 165–66, 170. The First Circuit, deferring pursuant to *Chevron*, agreed. *Id.* at 170. The ATA's facial challenge derives no support from that ruling.

C. Guidance to Airports

The ATA next argues the Amendments do not comply with 49 U.S.C. § 47129(b)(2). That provision requires the Department to establish "standards or guidelines" for the Secretary of Transportation to use "in determining ... whether an airport fee is reasonable," but airports understandably use that guidance to anticipate how the Secretary will evaluate the reasonableness of the fees they charge. The ATA maintains the only guidance the Amendments provide is the tautology that a fee "is not unreasonable as long as it is reasonable." The DOT responds that, because the Amendments "specif[y] the methodologies [airports] may use" to set landing fees at congested times, the Amendments provide more and sufficient guidance, and we agree.

We have not hesitated in the past to fault the DOT when it failed to provide adequate guidance to airport operators. The 1996 Policy capped airfield fees at historical cost but allowed airports to set non-airfield fees using essentially "any reasonable methodology," 61 Fed. Reg. at 32,020/3; upon the ATA's petition for review, we noted the "'guideline' seems to be missing a 'line'" because the concept of "*any* reasonable

methodology .... does not seem to add much—if anything—to the statutory requirement that airport fees be reasonable." *ATA I*, 119 F.3d at 41. We vacated portions of the 1996 Policy because the Department failed adequately to explain the distinction it drew between airfield and non-airfield fees. *See id.* at 43; 129 F.3d at 625.

As we have pointed out, however, when the "Congress has 'not specified the level of specificity expected of the agency, ... the agency [is] entitled to broad deference in picking the suitable level.'" *Cement Kiln Recycling Coal. v. EPA*, 493 F.3d 207, 217 (2007) (quoting *Ethyl Corp. v. EPA*, 306 F.3d 1144, 1149 (D.C. Cir. 2002)). Here, because the call for "standards or guidelines" in the Federal Aviation Authorization Act, 49 U.S.C. § 47129(b)(2), "does not mandate any particular level of specificity," *Cement Kiln*, 493 F.3d at 218, we will defer to any reasonable interpretation by the DOT. *See Chevron*, 467 U.S. 837; *Cement Kiln*, 493 F.3d at 217 (citing *Chevron*).

Because the Amendments leave only two variables to the discretion of the airport proprietor, and thus set out a nearly complete pricing algorithm, we conclude the DOT has provided sufficient guidance. The two-part fee the Amendments permit reflects two major components of airfield costs: the cost per landing and the cost imposed in proportion to the weight of an aircraft. *See* 73 Fed. Reg. at 40,443–44. Limiting the fees to those components provides specific guidance and is specific enough to constrain an airport proprietor's pricing discretion. In addition, the Amendments and the 1996 Policy limit the total fees an airport may collect. *See id.* at 40,445/1–2; 61 Fed. Reg. at 32,019/2–3.

The Amendments set reasonably specific standards because the airport proprietor is free only to calculate the fixed charge per operation and to determine how the variable weight component is to be scaled to aircraft weight. The Amendments therefore discharge the Department's statutory obligation to set "standards or guidelines that shall be used by the Secretary in determining ... whether an airport fee is reasonable," 49 U.S.C. § 47129(b)(2).

Nonetheless the ATA faults the DOT for "us[ing] the word 'reasonable' [in the Order promulgating the Amendments] as though it [were] self-defining." Many of the specific instances of which the ATA complains appear in the background section of the Order — the "concise general statement of ... basis and purpose" required of every regulation subject to the Administrative Procedure Act, 5 U.S.C. § 553(c) — not in the Amendments themselves. Surely the DOT may discuss reasonableness in general terms when introducing and explaining the purpose of a rule. As for the use of "reasonable" in the Amendments themselves, we fail to see why adding the requirement of reasonableness to a rule that independently provides adequate guidance takes the rule out of compliance with the statutory mandate. If, for example, a highway has a posted speed limit and at the same time a statute prohibits "driv[ing] a vehicle on a highway at a speed greater than is reasonable," Ariz. Rev. Stat. § 28-701, it simply would not follow that a motorist is given inadequate guidance about how fast he may drive. *See Arizona v. Rich*, 563 P.2d 918, 919–20 (Ariz. Ct. App. 1977) (rejecting vagueness challenge).

D. Change of Policy

The ATA argues that because the Amendments work a change in DOT policy the Department "has additional

obligations to justify that change." We have long held that "an agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored." *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (1970). Here the ATA identifies two specific changes of policy: (1) including in the rate base costs of some facilities not yet in service, and (2) including in the rate base of a primary airport the costs of a secondary airport. The DOT first denies having made any changes in policy that require explanation because it "has not previously addressed modified congestion pricing by airports." We need not resolve that particular squabble, however, because we conclude the DOT adequately explained its reasons for promulgating the two bits about which the ATA complains.

In 1996 the DOT explained, "when fees are based on cost, it is generally unreasonable to charge users for facilities they do not benefit from or use," but at the same time recognized that doing so might be reasonable in some circumstances. 61 Fed. Reg. at 32,002/2. The DOT then balanced various "conflicting concerns" and concluded the only costs of future facilities an airport could include in its rate base, and then only under certain circumstances, were "the costs of land acquired for future airport development." *Id.* at 32,020/3. The present Amendments to the 1996 Policy allow an airport more broadly to add to its rate base "a portion of the costs of an airfield project under construction," again subject to certain conditions. 73 Fed. Reg. at 40,445.

The 1996 Policy also permits an airport proprietor to include the costs of an alternate airport in the rate base of a primary airport if those costs "are reasonably related to the aviation benefits that the other airport provides or is expected to provide to aeronautical users of the first airport." 61 Fed.

Reg. at 32,020/3; *see also id.* at 32,014. The Policy specifies that the requirement of benefits to the users of the first airport "will be presumed to be satisfied if the other airport is designated as a reliever airport for the first airport [by] the FAA[]." *Id.* at 32,020/3. The Amendments do not change the general standard, but they do add that benefits to the users of the first airport also will be presumed if

> adding airfield costs of the second airport to the rate base of the first airport during congested hours would have the effect of reducing or preventing congestion and operating delays at [the first] airport in those hours.

73 Fed. Reg. at 40,445/2.

The DOT provided a "reasoned analysis" for these two aspects of the Amendments, considering that "[a]n agency's view of what is in the public interest may change, either with or without a change in circumstances." *Greater Boston*, 444 F.2d at 852. Most fundamentally, the DOT identified a major change in the world around it between 1996 and 2008: Airport congestion had increased significantly. In explaining the need for the Amendments, it detailed congestion at specific airports and recounted the findings of the Federal Aviation Administration about chronic congestion. *See* 73 Fed. Reg. at 40,431–32 (citing Federal Aviation Administration, *Capacity Needs in the National Airspace System 2007–2025: An Analysis of Airports and Metropolitan Area Demand and Operational Capacity in the Future* (May 2007)). It reasoned that congestion pricing "could encourage more efficient use of [congested] airports" and explained how increasing an airport's rate base and allowing it to impose a two-part landing fee could approximate congestion pricing. 73 Fed. Reg. at 40,431–32.

Of course, congestion is not an entirely new problem. More than 40 years ago "the press, the government, the airlines, the airport operators themselves, and a host of others [told us] that our airports are in a state of 'crisis.'" Levine, *Landing Fees*, 12 J.L. & Econ. at 79. The DOT, however, has a continuing mandate to manage the Nation's air transportation system. As the airspace is used ever more intensively, it is unsurprising that the Department would update its approach to landing fees in an effort to relieve airport congestion. So long as it complies with the applicable statutes, its creativity should be welcomed on its merits, not spurned for its novelty.

## III. Conclusion

For the foregoing reasons, the petition for review is

*Denied.*