# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued May 13, 2019        Decided August 2, 2019

No. 18-1303

EXHAUSTLESS INC.,
PETITIONER

v.

FEDERAL AVIATION ADMINISTRATION,
RESPONDENT

———

Consolidated with 18-1304

———

On Petitions for Review of Orders
of the Federal Aviation Administration

———

*Kevin M. Blair* argued the cause and filed the briefs for petitioner.

*Benjamin M. Shultz*, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the brief were *Michael S. Raab*, Attorney, U.S. Department of Justice, and *Steven G. Bradbury*, General Counsel, *Paul M. Geier*, Assistant General Counsel, *Joy K. Park*, Senior Trial Attorney, and *Arjun Garg*, Chief Counsel, Federal Aviation Administration.

Before: HENDERSON, SRINIVASAN, and PILLARD, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* SRINIVASAN.

SRINIVASAN, *Circuit Judge*: In 1968, the Federal Aviation Administration began limiting the number of flights serving LaGuardia and John F. Kennedy Airports in New York in order to reduce flight delays. In 2000, Congress mandated the repeal of the relevant regulations based on concerns about their anticompetitive effects. The phase-out process, however, caused flight delays to skyrocket at LaGuardia and JFK Airports. The FAA then issued interim orders again limiting the number of flights serving those airports. The FAA has since extended the interim orders many times as efforts to establish a permanent solution have failed.

Exhaustless, Inc., brings two petitions for review of the latest interim extension orders. Exhaustless would like LaGuardia and JFK Airports to implement the company's patent-pending product, Aviation 2.0 Operating System, to manage the allocation of takeoff and landing "slots" to airlines.

We dismiss Exhaustless's petitions for lack of standing. The company fails to demonstrate that vacating the interim FAA orders would redress its injury—i.e., a lack of market opportunity for its product. Vacating the interim orders would leave takeoffs and landings at the airports unregulated, eliminating the need for the company's product at the federal level. To the extent Exhaustless argues that the local airport authority could employ Aviation 2.0 if there were no federal regulation, we find any such possibility too speculative to support the company's standing to bring these petitions.

3

I.

The Federal Aviation Act calls for the FAA to "assign by regulation or order the use of the airspace necessary to ensure the safety of aircraft and the efficient use of airspace." 49 U.S.C. § 40103(b)(1). Navigable airspace includes the "airspace needed to ensure safety in the takeoff and landing of aircraft." *Id.* § 40102(a)(32).

Since 1968, the FAA has restricted the number of takeoffs and landings at certain highly congested airports in order to reduce inefficient flight delays. The restrictions were codified in a series of regulations known as the High Density Rule. As of 2000, the rule placed numerical limits on the hourly takeoffs and landings at five highly congested airports: Newark Liberty, LaGuardia, JFK, O'Hare, and Ronald Reagan Washington National. 14 C.F.R. § 93.123 (2000).

By then, Congress had grown concerned with the High Density Rule's collateral effects on airport access for carriers and competition among carriers. Acting on those concerns in 2000, Congress prohibited the use of the High Density Rule at LaGuardia or JFK Airports after January 1, 2007. 49 U.S.C. § 41715(a). For the period leading up to that date, Congress directed the FAA to grant slot exemptions for carriers servicing smaller airports and carriers with little or no existing service at the airports. *Id.* § 41716.

Congress's action led to an immediate increase in airport congestion at LaGuardia. As the FAA began granting slot exemptions, "the number of scheduled flight operations at LaGuardia began to far exceed the airport's capacity even under optimal operating conditions." 71 Fed. Reg. 54,331, 54,331 (Sept. 14, 2006). The average minutes of delay for arriving flights increased 144% between March and September

of 2000. *Id.* at 54,332. By September 2000, flight delays at LaGuardia accounted for 25% of the delays nationwide. *Id.* The FAA responded by limiting the number of slot exemptions. From late 2000 until the end of 2006, the High Density Rule, with the exemption cap, governed the number of slots at LaGuardia. *Id.* at 54,332 & n.9.

Because the High Density Rule was set to expire by 2007, the FAA, in August 2006, proposed a new permanent congestion management rule for LaGuardia and requested comments. 71 Fed. Reg. 51,360 (Aug. 29, 2006). A few weeks later, the agency explained that the permanent rule would not be finalized by the end of the year and that it was necessary to implement an interim rule to avert crippling delays. 71 Fed. Reg. 54,331 (Sept. 14, 2006).

The FAA issued an interim order in December 2006. 71 Fed. Reg. 77,854 (Dec. 27, 2006). The rule made clear that it was a temporary measure and reiterated the agency's "need to complete the rulemaking, because the final decision in that proceeding should establish a more rational basis for the regulation of flight operations at LaGuardia." *Id.* at 77,856. The interim rule resembled the High Density Rule and generally grandfathered the slots held by airlines under the previous regime. *Id.* at 77,859–61.

Regulatory efforts concerning JFK Airport followed a somewhat different path but ended in much the same place. With respect to JFK, the FAA allowed the High Density Rule to expire in 2007 without a replacement. Unsurprisingly, the number of flights at JFK spiked, and with more planes came more delays. In 2007, the average daily operations at JFK increased 21% over the prior year and on-time arrival rates declined from 68.5% to 62.2%. 73 Fed. Reg. 3510, 3511 (Jan. 18, 2008).

In 2008, the FAA published an interim order limiting the number of takeoffs and landings at JFK. *Id.* at 3516–42. Like the LaGuardia order, the JFK order stressed its "short-term nature," stating that it was "not intended to create a long-term solution to congestion." *Id.* at 3513–14.

The FAA's first attempt at a permanent solution for LaGuardia and JFK Airports came via rules promulgated in October 2008. 73 Fed. Reg. 60,574 (Oct. 10, 2008); 73 Fed. Reg. 60,544 (Oct. 10, 2008). Under those rules, a portion of the slots would be allocated using an auction. 73 Fed. Reg. at 60,577; 73 Fed. Reg. at 60,547. A number of airlines and trade groups, along with the local airport authority, promptly challenged the rules in our court. The challengers moved for an immediate stay, contending that the FAA lacked statutory authority to conduct slot auctions. We granted the motion. Order, *Port Auth. of N.Y. & N.J. v. FAA*, No. 08-1329 (D.C. Cir. Dec. 8, 2008), J.A. 365. The FAA then rescinded the rules. 74 Fed. Reg. 52,134 (Oct. 9, 2009); 74 Fed. Reg. 52,132 (Oct. 9, 2009).

The agency extended the interim orders for both LaGuardia and JFK Airports until October 2011, noting that a permanent solution would require more time. 74 Fed. Reg. 51,653 (Oct. 7, 2009); 74 Fed. Reg. 51,650 (Oct. 7, 2009). A series of additional extensions followed. In April 2011, the FAA extended the orders until October 2013. 76 Fed. Reg. 18,620 (Apr. 4, 2011); 76 Fed. Reg. 18,616 (Apr. 4, 2011). In May 2013, the FAA extended the orders to October 2014. 78 Fed. Reg. 28,278 (May 14, 2013); 78 Fed. Reg. 28,276 (May 14, 2013). And in March 2014, the FAA again extended the orders, to October 2016. 79 Fed. Reg. 17,222 (Mar. 27, 2014); 79 Fed. Reg. 16,854 (Mar. 26, 2014).

In January 2015, the agency proposed a final rule for New York–area airports that included a secondary market for the purchase, sale, lease, or trade of slots between airlines. 80 Fed. Reg. 1274 (Jan. 8, 2015). But in May 2016, after receiving comments, the FAA withdrew the proposed rule. 81 Fed. Reg. 30,218 (May 16, 2016). That led the agency to extend the interim orders yet again, until October 2018. 81 Fed. Reg. 33,126 (May 25, 2016); 81 Fed. Reg. 32,636 (May 24, 2016).

In September 2018, the FAA once more extended the interim orders for LaGuardia and JFK Airports, this time until October 2020. 83 Fed. Reg. 47,065 (Sept. 18, 2018); 83 Fed. Reg. 46,865 (Sept. 17, 2018). Those latest extensions are at issue here. While the orders largely match the prior extensions in substance, they are less committal about a permanent rule, stating only that the agency "will continue to consider potential rulemaking in the future to codify the slot management policies at [LaGuardia], and also at John F. Kennedy International Airport (JFK)." 83 Fed. Reg. at 47,065.

Petitioner Exhaustless, Inc., as noted, has developed a patent-pending product called Aviation 2.0 Operating Standard for allocating airline slots at airports. Using Aviation 2.0, carriers would compete in semi-annual auctions to purchase slots for a six-month period, with the total number of slots determined by Exhaustless using its proprietary technology. Passengers would then pay demand-calibrated congestion premiums (on top of their airfare) when purchasing tickets. Both the congestion premiums and the auction proceeds would go to Exhaustless.

## II.

Exhaustless asserts several challenges to the latest interim extension orders in its petitions for review, including

arguments that the FAA exceeded its statutory authority and violated the Administrative Procedure Act. We cannot address the merits of those claims unless Exhaustless has constitutional standing. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101–02 (1998). To establish standing, Exhaustless must demonstrate that: (i) it has suffered an injury-in-fact that is "concrete and particularized" and "actual or imminent"; (ii) the injury is "fairly traceable to the challenged action" of the respondent; and (iii) it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (formatting modified).

The latter two elements, traceability and redressability, "overlap as two sides of a causation coin." *Dynalantic Corp. v. Dep't of Def.*, 115 F.3d 1012, 1017 (D.C. Cir. 1997). When a petitioner itself is the object of the challenged agency action, there usually is little doubt of causation. *See Lujan*, 504 U.S. at 561–62. But when a petitioner's injury arises from an agency's "unlawful regulation (or lack of regulation) of *someone else*," causation often is "substantially more difficult" to establish because the petitioner must demonstrate that the injury does not result from "the independent action of some third party not before the court." *Id.* at 560, 562.

Exhaustless fails to demonstrate redressability. The company contends that it "is being deprived of the opportunity to compete in the market with its patent-pending proposed solution" Aviation 2.0 so long as the FAA's interim orders remain in place. Exhaustless Br. 25; *id.* at 27. Exhaustless envisions that, if the interim orders—including their limitations on slots at LaGuardia and JFK—were withdrawn, the agency would then "transfer the management of service (slot volumes), for congestion-prevention purposes, to Exhaustless." Exhaustless Inc., Aviation 2.0—Explained, FAA Add. A39.

Vacatur of the interim orders, however, would not get the company closer to that goal. Without the orders, there would be no federally mandated number of takeoff and landing slots at LaGuardia and JFK Airports, no scarce resource for the FAA to auction, and hence no market for Exhaustless's product, at least as concerns the federal government. The relief sought by the company in its petitions for review—i.e., vacatur of the interim orders—thus would not redress its claimed injury.

The appropriate administrative channel for Exhaustless to pursue instead is a petition for rulemaking with the agency to employ the company's technology. And because the interim rules are revocable at will, the orders challenged by Exhaustless in this proceeding do not stand in the way of the company's attempting to persuade the FAA to adopt its technology via a rulemaking. Indeed, Exhaustless has already filed such a petition for rulemaking. Petition for Rulemaking—FAA-2007-0001 (filed May 21, 2018), J.A. 499. The petition remains pending with the FAA, and, should the agency reject it, Exhaustless would have standing to seek judicial review.

At oral argument, Exhaustless submitted that vacatur of the FAA's interim rules would create a different market opportunity: vacatur in theory would result in transfer of control over flight schedules at LaGuardia and JFK Airports from federal to local authority, i.e., the Port Authority of New York and New Jersey, which could then elect to use Aviation 2.0. That argument for standing fares no better.

While the loss of an opportunity to compete for business can constitute Article III injury, there must be a "realistic possibility" of winning the eventual competition. *Ranger Cellular v. FCC*, 348 F.3d 1044, 1050 (D.C. Cir. 2003) (quoting *Albuquerque Indian Rights v. Lujan*, 930 F.2d 49, 56 (D.C. Cir. 1991)). Here, the hurdles to the Port Authority's

adoption of Aviation 2.0 to manage flights at the airports are too significant and too numerous for us to find it "likely, as opposed to merely speculative," that vacatur of the interim orders would redress Exhaustless's injury. *Lujan*, 504 U.S. at 561 (internal quotation marks omitted).

First, the FAA operates under a duty "to ensure . . . the efficient use of airspace." 49 U.S.C. § 40103(b)(1). Since 1968, the Administration has fulfilled that responsibility by limiting the number of takeoffs and landings at LaGuardia and JFK because the airports cannot accommodate the number of flights airlines would like to operate there without causing undue congestion. *See* 33 Fed. Reg. 17,896 (Dec. 3, 1968). The Chief Operating Officer of the FAA's Air Traffic Administration testified that, absent the interim orders, she would expect "demand for additional flights . . . to far exceed the runway capacity resulting in extensive localized and systemic delays and flight cancellations." Bristol Decl. ¶ 4, FAA Add. A28. Recall that, in 2000, merely allowing exemptions from slot limitations caused LaGuardia to account for 25% of flight delays nationwide. 71 Fed. Reg. at 54,332. Exhaustless's suggestion that our vacating the interim orders would lead the FAA to delegate authority over flight schedules at LaGuardia and JFK Airports to the Port Authority defies history and blinks reality.

Second, both LaGuardia and JFK Airports have accepted federal grants for airport development under the Airport Improvement Program. Federal Aviation Administration, FY 2019 Primary Entitlements (May 10, 2019), https://www.faa.gov/airports/aip/grantapportion_data/media/FY-2019-Primary-Entitlements.pdf. As a condition of accessing those funds, the airports must pledge that they will be "available for public use on reasonable conditions and without unjust discrimination." 49 U.S.C. § 47107(a)(1). That

assurance prohibits airlines from assessing unreasonable fees. *See Air Transp. Ass'n of Am. v. DOT*, 613 F.3d 206, 210 (D.C. Cir. 2010). And Congress has assigned the Secretary of Transportation primary responsibility for determining whether airport fees are reasonable. *See* 49 U.S.C. § 47129. Under current regulations, airports may charge landing fees so long as they do not exceed the historical costs captured by an airport's "rate base." 78 Fed. Reg. 55,330, 55,333–35 (Sept. 10, 2013); *Air Transp.*, 613 F.3d at 211. But Exhaustless's technology relies on charging carriers a market-clearing auction price rather than a cost-based landing fee, and in doing so runs into conflict with JFK's and LaGuardia's grant assurances.

Third, there are substantial obstacles to charging passengers a "dedicated Congestion-Prevention Premium," as Exhaustless contemplates. Exhaustless Inc., Aviation 2.0—Explained, FAA Add. A39. To the extent the company envisions that the local airport authority would assess the premium, it fails to account for the Anti-Head Tax Act, which provides that any "political subdivision of a State . . . may not levy or collect a tax, fee, head charge, or other charge on . . . an individual traveling in air commerce." 49 U.S.C. § 40116(b). To the extent the company contemplates collection of the fee by the airlines, the FAA's Director of the Office of Aviation Analysis explained that Exhaustless's "proposal would require the carriers to substantially redesign their technology to integrate a dynamic third-party fee" and that it was "unlikely that carriers would do this voluntarily." Homan Decl. ¶ 4, FAA Add. A56. And if the companies decline to collect the fee voluntarily, Exhaustless does not explain the airports' authority to compel airlines to assess the charge.

Fourth, adopting Exhaustless's proposal could jeopardize the United States' compliance with international agreements on commercial air travel. For instance, an agreement between the

United States and Canada guarantees Canadian airlines a minimum of 42 slots at LaGuardia. *See* Air Transport Agreement Between the Government of the United States and the Government of Canada, T.I.A.S. No. 07-312, Ann. II § 1 (Mar. 12, 2007). Yet Exhaustless evidently seeks to auction off all the slots at LaGuardia without regard to a carrier's nationality.

Finally, even if Exhaustless were able to overcome each of those hurdles, Aviation 2.0 remains an unproven product. The product has yet to be adopted by any airport in the nation even though the vast majority of them are not subject to FAA slot regulation and thus could adopt it today. We find it doubtful that two of the busiest airports in the nation would volunteer to act as the test sites for Aviation 2.0, even assuming the agency would permit them to do so. In view of all of those legal and practical obstacles, the notion that vacating the interim orders would create a business opportunity for Exhaustless amounts to mere conjecture.

Our conclusion in that regard does not mean that the challenged interim orders are entirely insulated from review. Standing principles under Article III exist to ensure that a litigant alleges "such a personal stake in the outcome of the controversy as to warrant *his* invocation of federal-court jurisdiction." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (internal quotation marks omitted). An airline or airport authority likely would have standing to petition for review of the orders. But no member of the regulated community has joined Exhaustless's challenge or (as far as we know) filed its own petition for review, suggesting a form of acceptance among the parties having the most direct stake. Article III denies us any license to disrupt that evident acceptance today.

12

\* \* \* \* \*

For the foregoing reasons, we dismiss Exhaustless's petitions for review for lack of jurisdiction.

*So ordered.*