# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued May 3, 2019            Decided April 7, 2020

No. 18-1172

NATURAL RESOURCES DEFENSE COUNCIL,
PETITIONER

v.

ANDREW WHEELER, ADMINISTRATOR, U.S. ENVIRONMENTAL
PROTECTION AGENCY AND ENVIRONMENTAL PROTECTION
AGENCY,
RESPONDENTS

ARKEMA INC. AND MEXICHEM FLUOR, INC.,
INTERVENORS

---

Consolidated with 18-1174

---

On Petitions for Review of an Action of the
United States Environmental Protection Agency

---

*Peter J. DeMarco* argued the cause for petitioner Natural Resources Defense Council. With him on the briefs were *Melissa J. Lynch* and *David D. Doniger*.

*Joshua M. Tallent*, Assistant Attorney General, Office of the Attorney General for the State of New York, argued the cause for State Petitioners. With him on the briefs were *Letitia James*, Attorney General, *Barbara D. Underwood*, Solicitor General, *Steven C. Wu*, Deputy Solicitor General, *Michael J. Myers*, Senior Counsel, and *Morgan A. Costello*, Chief, Office of the Attorney General for the State of New York; *Kwame Raoul*, Attorney General, and *Daniel I. Rottenberg*, Assistant Attorney General, Office of the Attorney General for the State of Illinois; *Xavier Becerra*, Attorney General, *David A. Zonana*, Supervising Deputy Attorney General, and *Megan K. Hey*, Deputy Attorney General, Office of the Attorney General for the State of California; *Maura Healey*, Attorney General, *Christophe G. Courchesne*, Assistant Attorney General, and *Megan M. Herzog*, Special Assistant Attorney General, Office of the Attorney General for the Commonwealth of Massachusetts; *Ellen F. Rosenblum*, Attorney General, and *Paul A. Garrahan*, Attorney-in-Charge, Office of the Attorney General for the State of Oregon; *Kathleen Jennings*, Attorney General, and *Valerie M. Edge*, Deputy Attorney General, Office of the Attorney General for the State of Delaware; *Keith Ellison*, Attorney General, and *Max H. Kieley*, Assistant Attorney General, Office of the Attorney General for the State of Minnesota; *Robert A. Reiley*, Assistant Counsel, Commonwealth of Pennsylvania Department of Environmental Protection; *Karl A. Racine*, Attorney General, and *Loren L. AliKhan*, Solicitor General, Office of the Attorney General for the District of Columbia; *Gurbir S. Grewal*, Attorney General, and *Lisa J. Morelli*, Deputy Attorney General, Office of the Attorney General for the State of New Jersey; *Thomas J. Donovan*, *Jr.*, Attorney General, and *Nicholas F. Persampieri*, Assistant Attorney General, Office of the Attorney General for the State of Vermont; *Robert W. Ferguson*, Attorney General, and

*Katharine G. Shirey*, Assistant Attorney General, Office of the Attorney General for the State of Washington.

*Benjamin Carlisle*, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the brief were *Jeffrey Bossert Clark*, Assistant Attorney General, *Jonathan Brightbill*, Deputy Assistant Attorney General, and *Jan M. Tierney* and *Diane E. McConkey*, Attorneys, U.S. Environmental Protection Agency.

*Keith Bradley* argued the cause for intervenors. With him on the brief were *W. Caffey Norman*, *Dan Himmelfarb*, *John S. Hahn*, *Roger W. Patrick*, and *William J. Hamel*.

Before: SRINIVASAN, *Chief Judge*, and TATEL and RAO, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* SRINIVASAN.

Dissenting opinion filed by *Circuit Judge* RAO.

SRINIVASAN, *Chief Judge*: Thirty years ago, Congress amended the Clean Air Act to require that users of ozone-depleting substances transition to use of less harmful substitutes. Many users replaced ozone-depleting substances with hydrofluorocarbons (HFCs). Over time, though, scientists came to understand that HFCs, while not ozone-depleting substances, are powerful greenhouse gases that contribute to climate change.

In 2015, EPA issued a regulation disallowing the use of HFCs as a substitute for ozone-depleting substances. That rule was challenged in our court in *Mexichem Fluor, Inc. v. EPA*, 866 F.3d 451 (D.C. Cir. 2017). We determined that EPA could validly forbid current users of ozone-depleting substances from

switching to HFCs.  But we also concluded that EPA lacked authority to force users who had already switched to HFCs to make a second switch to a different substitute.  We thus vacated the rule in part and remanded to the agency.

On remand, even though we had sustained EPA's bar against use of HFCs with regard to entities who were still using ozone-depleting substances, the agency decided to implement our decision by suspending the rule's listing of HFCs as unsafe substitutes in its entirety, meaning that even current users of ozone-depleting substances can now shift to HFCs.  And EPA did so without going through notice-and-comment procedures.

The Natural Resources Defense Council and a group of states have now filed petitions for review in our court.  They argue among other things that EPA's rule on remand improperly amended the agency's earlier rule without adhering to notice-and-comment procedures.  We agree, and we therefore grant the petitions for review and vacate the challenged rule.

I.

In the 1970s, scientists realized that some chemicals used by humans deplete the layer of ozone gas above the Earth's surface that protects humans from ultraviolet radiation's harmful effects.  *See Nat. Res. Def. Council v. EPA*, 464 F.3d 1, 3 (D.C. Cir. 2006).  Based on those concerns, the United States and other countries, in the late 1980s, developed the Montreal Protocol on Substances that Deplete the Ozone Layer, Sept. 16, 1987, S. Treaty Doc. No. 100–10, 1522 U.N.T.S. 29.  The Protocol is an international agreement requiring signatories to regulate ozone-depleting substances.

In 1990, Congress implemented the United States' obligations under that agreement by adding to the Clean Air Act a new Title VI, 42 U.S.C. § 7671 *et seq.* Title VI requires that, "[t]o the maximum extent practicable," ozone-depleting substances "be replaced by chemicals, product substitutes, or alternative manufacturing processes that reduce overall risks to human health and the environment." *Id.* § 7671k(a). And to help guard against the replacement of ozone-depleting substances with alternatives that are themselves harmful, the statute directs EPA to promulgate rules making it unlawful to replace ozone-depleting substances with substances that "may present adverse effects to human health or the environment." *Id.* § 7671k(c). To that end, EPA must maintain lists of "prohibited" and "safe" substitutes for specific uses. *Id.*

EPA has promulgated a number of regulations approving or prohibiting various substitutes for certain end-uses. *See, e.g.*, Protection of Stratospheric Ozone: Listing of Substitutes for Ozone-Depleting Substances, 68 Fed. Reg. 4004 (Jan. 27, 2003); Protection of Stratospheric Ozone, 59 Fed. Reg. 13,044 (Mar. 18, 1994). One group of substitutes addressed in many of those regulations is hydrofluorocarbons (HFCs), a family of "substances that contain hydrogen, fluorine, and carbon." *Mexichem*, 866 F.3d at 455. In 1994, EPA "concluded that certain HFCs were safe substitutes for ozone-depleting substances when used in aerosols, motor vehicle air conditioners, commercial refrigerators, and foams, among other things." *Id.* Over the following decade, EPA "added HFCs to the list of safe substitutes for a number of other products." *Id.* Throughout the 1990s and 2000s, as businesses transitioned away from ozone-depleting substances, they often employed HFCs as a substitute. *See id.*

But over time, EPA became increasingly concerned about HFCs. Although HFCs are not ozone-depleting substances,

they are powerful greenhouse gases that, in EPA's view, "may contribute to climate change, increasing the incidence of mortality and the likelihood of extreme weather events such as floods and hurricanes." *Id.* In 2015, after going through notice-and-comment procedures, EPA promulgated a rule moving some HFCs from the safe substitutes list to the prohibited substitutes list. *See* Protection of Stratospheric Ozone: Change of Listing Status for Certain Substitutes Under the Significant New Alternatives Policy Program, 80 Fed. Reg. 42,870 (July 20, 2015). The 2015 Rule prohibited current users of ozone-depleting substances from replacing those substances with HFCs. But the Rule also went further, prohibiting the continued use of certain HFCs by users who had already switched from ozone-depleting substances to HFCs. *See Mexichem*, 866 F.3d at 456.

The latter measure proved too ambitious. In *Mexichem*, we determined that EPA's attempt to regulate users who had already switched from ozone-depleting substances to HFCs exceeded the agency's statutory authority. Title VI, we concluded, only "makes it unlawful to 'replace' an ozone-depleting substance that is covered . . . with a substitute substance that is on the list of prohibited substitutes." *Id.* at 458 (quoting 42 U.S.C. § 7671k(c)). And businesses "'replace' an ozone-depleting substance when they transition to making [or using] the same product with a substitute substance. After that transition has occurred, the replacement has been effectuated," and there is no longer an "ozone-depleting substance to 'replace.'" *Id.* at 459. And because HFCs are not ozone-depleting substances, we concluded that once an entity replaces ozone-depleting substances with HFCs, its HFC use is no longer regulated by Title VI. In that situation, we held, EPA lacks authority to require a second substitution in place of HFCs. *See id.*

At the same time, with regard to EPA's decision to move HFCs to the list of prohibited substitutes on a going-forward basis, we reaffirmed that the agency may "move a substitute from the list of safe substitutes to the list of prohibited substitutes" and "may prohibit a manufacturer [or other regulated entity] from replacing an ozone-depleting substance that is covered under Title VI with a prohibited substitute." *Id.* at 457. We also rejected the petitioners' myriad arbitrary-and-capricious challenges, holding that "EPA reasonably removed HFCs from the list of safe substitutes." *Id.* at 462–63. For those reasons, we granted the petitions for review of the 2015 Rule "in part," by vacating the 2015 Rule only "to the extent it requires manufacturers to replace HFCs with a substitute substance." *Id.* at 464.

Eight months later, in April 2018, EPA published in the Federal Register a rule explaining its "response to the court's decision." *See* Protection of Stratospheric Ozone: Notification of Guidance and a Stakeholder Meeting Concerning the Significant New Alternatives Policy (SNAP) Program, 83 Fed. Reg. 18,431, 18,432 (Apr. 27, 2018). EPA issued the 2018 Rule without going through notice-and-comment procedures. Although EPA recognized that *Mexichem* effected only a "partial vacatur of the 2015 Rule," the agency determined that it would "not apply the HFC use restrictions or unacceptability listings in the 2015 Rule for any purpose prior to completion" of an anticipated future rulemaking on the subject. *Id.* at 18,433 (italics omitted). EPA's decision to stop applying the HFC restrictions in their entirety, rather than only with respect to users who had already switched to HFCs (as *Mexichem* had contemplated), rested primarily on two bases.

First, EPA explained that the "regulatory text promulgated in the 2015 Rule" had consisted of "individual listing decisions" that prohibited or restricted the use of a given HFC

in a given end-use, without regard to the distinction drawn in *Mexichem* between users who had already switched to HFCs and users still using ozone-depleting substances. *Id.* at 18,434. "[F]or each listing decision," EPA reasoned, "there is no language that could be understood as being removed or struck out by the court so that some portion of the listing would remain in effect pending EPA's action on remand." *Id.* Second, EPA determined that "attempting to draw the distinctions made by the court would present practical difficulties for implementation." *Id.* For example, the agency posited, there could be "complex situations" in which a regulated entity uses ozone-depleting substances in some facilities and HFCs in other facilities, such that it would be unclear whether the entity had already "replaced" ozone-depleting substances with HFCs. *Id.* at 18,435.

In sum, EPA "recognize[d] that the court" in *Mexichem* had "vacated the 2015 Rule 'to the extent that' it requires manufacturers to replace HFCs." *Id.* But given "its expertise in administering the [relevant] regulations, and its understanding of the 2015 Rule, EPA conclude[d] that the vacatur [could not] be implemented" in the way contemplated by our decision in *Mexichem*. *Id.* EPA instead decided to "treat[]" the vacatur "as striking the HFC listing changes in the 2015 Rule in their entirety." *Id.* And the agency thus determined that it "will not apply the HFC use restrictions or unacceptability listings in the 2015 Rule for any purpose." *Id.* EPA also announced that it was "prepar[ing] to undertake notice-and-comment rulemaking" to address various issues related to *Mexichem*, HFCs, and the safe substitutes program more generally. *Id.* at 18,435–36.

Following publication of that 2018 Rule, both the Natural Resources Defense Council and a group of states filed petitions for review of EPA's action in our court, which we consolidated.

Petitioners contend that the 2018 Rule is invalid, both because EPA improperly issued it without adhering to notice-and-comment procedures and because it is substantively arbitrary and capricious. In response, two intervenors (HFC manufacturers Arkema Inc. and Mexichem Fluor, Inc.) argue that we lack jurisdiction over the petitions for review because petitioners fail to demonstrate their standing to seek relief. In addition, the intervenors and EPA contend that we lack jurisdiction because the 2018 Rule is not final agency action, and they also defend the Rule on the merits.

II.

A.

We begin by considering petitioners' standing. Because Article III of the Constitution limits us to "resolving cases and controversies, a showing of standing is an essential and unchanging predicate to any exercise of our jurisdiction." *Nat. Res. Def. Council v. EPA*, 755 F.3d 1010, 1016 (D.C. Cir. 2014) (internal quotation marks omitted). To establish standing, a party must demonstrate: "(1) an injury in fact that is concrete and particularized as well as actual or imminent; (2) a causal connection between the injury and the challenged conduct; and (3) a likelihood, as opposed to mere speculation, that the injury will be redressed by a favorable decision." *Id.* (internal quotation marks omitted). In addition, when a representational organization like NRDC sues on behalf of its members, it must also show that (1) "its members would otherwise have standing to sue in their own right"; (2) "the interests it seeks to protect are germane to the organization's purpose"; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members." *Id.* (citation omitted).

Here, NRDC and at least one of the state petitioners have satisfied their burden to show an injury both caused by the 2018 Rule and likely to be redressed by a favorable decision. To link the 2018 Rule to an injury-in-fact, petitioners begin with the contention that the 2018 Rule, by vacating the entirety of the 2015 Rule's HFC listings, allows entities to switch from ozone-depleting substances to HFCs and thus will cause an increase in HFC emissions. While EPA does not contest that premise, intervenors do. They argue that the 2018 Rule will not cause any such increase because it is our decision in *Mexichem*, as opposed to the 2018 Rule, that "effectively undid the" 2015 Rule. *See* Intervenors Br. 27–28.

But, as is discussed below, petitioners' core contention in this case is that *Mexichem* only partially vacated the 2015 Rule, and that the 2018 Rule then had an independent legal effect by vacating the rest of the HFC listings in the 2015 Rule. And for purposes of determining standing, we must assume that petitioners will prevail on the merits of their argument. *See Defs. of Wildlife v. Gutierrez*, 532 F.3d 913, 924 (D.C. Cir. 2008). We thus assume that petitioners are correct that the 2018 Rule, and not *Mexichem*, completed the vacatur of the 2015 Rule's HFC listings. And no party disputes petitioners' contention that allowing additional entities to use HFCs will in fact lead to additional use of HFCs.

Once we accept the premise that the 2018 Rule will lead to an increase in HFC emissions, the rest of the standing analysis falls readily into place. As the parties agree, the release of HFCs contributes to climate change. And NRDC has submitted a declaration from a member averring that he owns coastal property in New Jersey that is especially vulnerable to weather events caused or worsened by climate change, and New York state similarly demonstrated its proprietary interest in coastal lands threatened by climate change. *See* NRDC Br.

S.A. 13–19; States Br. 23–24; Snyder Decl. ¶ 30; *cf. Massachusetts v. EPA*, 549 U.S. 497, 519 (2007). Petitioners then have adequately linked the 2018 Rule to an injury-in-fact: the 2018 Rule will lead to an increase in HFC emissions, which will in turn lead to an increase in climate change, which will threaten petitioners' coastal property. And of course, a vacatur of the 2018 Rule would redress that injury by restoring the 2015 Rule's HFC listings as applied to those entities that *Mexichem* found EPA could validly regulate, thereby reducing HFC emissions.

It follows that both NRDC and New York have established the injury, causation, and redressability requirements of standing, and New York has shown its standing. (Because New York has demonstrated its standing, we need not address the standing of the other state petitioners. *See Massachusetts*, 549 U.S. at 518). As noted above, however, NRDC must clear two additional hurdles to establish standing to bring its own separate petition because it is suing in a representational capacity: NRDC must show that its petition is germane to its purpose and that the claims asserted or relief sought do not require the involvement of its individual members.

NRDC satisfies both of those requirements. As NRDC explains in its brief, it is an environmental organization that is "committed to reducing emissions of greenhouse gases" and that has long "worked on multiple fronts to reduce HFC pollution." NRDC Br. 15–16; *cf. Nat. Res. Def. Council*, 755 F.3d at 1016 (allowing NRDC to proceed in a representational capacity in an environmental lawsuit). And NRDC neither seeks any individualized relief nor brings claims dependent on any individual member's factual circumstances, which means that no individual member's participation is necessary to its petition. We therefore find that NRDC, like New York, has established its standing to proceed.

12

B.

We next consider whether the 2018 Rule amounts to final agency action subject to judicial review. The Clean Air Act provides for judicial review only of "final action," 42 U.S.C. § 7607(b)(1), a limitation coterminous with the concept of "final agency action" in the Administrative Procedure Act, 5 U.S.C. § 704. *See Sierra Club v. EPA*, 873 F.3d 946, 951 (D.C. Cir. 2017). An action is "final if two independent conditions are met: (1) the action 'marks the consummation of the agency's decisionmaking process' and is not 'of a merely tentative or interlocutory nature;' and (2) it is an action 'by which rights or obligations have been determined, or from which legal consequences will flow.'" *Soundboard Ass'n v. Fed. Trade Comm'n*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (alteration omitted) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). The 2018 Rule satisfies both of those criteria.

1.

The 2018 Rule represents the consummation of EPA's decisionmaking process. Neither EPA nor intervenors contend otherwise, and for good reason.

The consummation prong of the finality inquiry requires us to determine "whether an action is properly attributable to the agency itself and represents the culmination of that agency's consideration of an issue," or is, instead, "only the ruling of a subordinate official, or tentative." *Id.* (citation omitted); *see id.* at 1269 (analyzing whether agency action is "subject to further agency review" (citation omitted)). Here, the 2018 Rule was issued under the authority of the Administrator himself, was published in the Federal Register, and was the culmination of EPA's consideration of the issue of how to treat the 2015 Rule's HFC listings pending any further

formal rulemaking.  The 2018 Rule thus is far removed from the types of agency action—such as informal letters issued by subordinate officials—that we have held do not amount to the culmination of an agency's decisionmaking process.  *See id.* at 1267–68.

The 2018 Rule marks the culmination of EPA's decisionmaking for finality purposes notwithstanding the agency's characterization of the Rule as an interim resolution: EPA has stated its intention to commence another rulemaking that will address the use of HFCs as replacements for ozone-depleting substances on a permanent basis, and the outcome of such a process could displace the 2018 Rule going forward. *See* 83 Fed. Reg. at 18,435–36.  But even if the 2018 Rule were to be displaced by another rule at some point, our precedents make clear that an interim agency resolution counts as final agency action despite the potential for a different permanent decision, as long as the interim decision is not itself subject to further consideration by the agency.  In that event, the interim resolution is the final word from the agency on what will happen up to the time of any different permanent decision.

For example, in *Clean Air Council v. Pruitt*, 862 F.3d 1 (D.C. Cir. 2017) (per curiam), we held that a stay of a regulation pending the resolution of a petition for reconsideration of the regulation qualified as final action:  "In effect, the Administrator has granted a modification of the mandatory [regulation] for the entire period of time that the petition is pending.   There is no indication that the [Administrator] intends to reconsider this decision or to vacate the grant of interim relief.  Thus, the [Administrator's] decision represents the final agency position on this issue . . . ." *Id.* at 6 (citation omitted).  Similarly, in *International Union, United Mine Workers of America v. Mine Safety & Health Administration*, 823 F.2d 608 (D.C. Cir. 1987), we held that we

had jurisdiction over a petition for review of the MHSA's decision to grant a mine operator interim relief from a safety standard pending resolution of the operator's petition for permanent modification of the standard. In that case too, we determined that the grant of relief was "final" notwithstanding its interim nature because there was "no indication that the Secretary intends to reconsider . . . or to vacate the grant of interim relief." *Id.* at 614–15.

Here, the 2018 Rule is even more final than were the interim decisions in *Clean Air Council* and *International Union*. In those cases, a proceeding that could result in an alteration of the interim resolution—a petition for reconsideration in *Clean Air Council*, and a petition for permanent modification in *International Union*—had already been commenced. Here, by contrast, EPA has indicated that it intends to undertake a further rulemaking at some point but has not formally initiated the process. And even if EPA in the future were to do so and were to promulgate a new rule addressing the treatment of HFCs under Title VI, the 2018 Rule firmly establishes EPA's current position that the 2015 Rule's HFC listings are unenforceable, and that position will continue to govern unless and until the agency issues a new rule. That counts as consummation of agency decisionmaking for finality purposes.

A contrary conclusion would be incompatible with our usual practice when an agency informs us that it wishes to reconsider a rule that is the subject of a pending petition for review before our court. In such a circumstance, we face a choice between remanding to the agency or continuing with our review. *See Utility Solid Waste Activities Grp. v. EPA*, 901 F.3d 414, 436–38 (D.C. Cir. 2018). But if the prospect of an agency's reconsideration of a rule sufficed to render the rule non-final, then when an agency tells us it wants to reconsider a

rule that is before us on review, we could neither remand to the agency nor continue our review. Instead, we would be compelled to dismiss for lack of jurisdiction, which we have never done (or thought it necessary to do) in that situation.

Additionally, if an agency's indication of an intent to reconsider an interim (or other) action sufficed to render the action non-final, agencies could evade judicial review of their actions even if they impose substantial obligations on regulated parties over a considerable period of time. Consider, in that regard, a recent case in our court, *Exhaustless v. FAA*, 931 F.3d 1209 (2019). That case involved the Federal Aviation Administration's regulation of take-off and landing slots at LaGuardia and John F. Kennedy Airports. *Id.* at 1210. In 2006 (for LaGuardia) and 2008 (for Kennedy), the FAA published "interim" regulations governing distribution of those slots ostensibly for a limited time, and professed an intent to finalize a permanent rule in the near future. *Id.* at 1210–12. More than a decade later, however, those "interim" regulations have been extended multiple times and remain in effect. *Id.* It would make little sense to deem such "interim" rules non-final—and hence non-challengeable—merely because of the prospect that they could be displaced at some point by further agency action.

Here, for instance, assuming that EPA has a good-faith intent to engage in a rulemaking that will settle the treatment of HFCs on an ostensibly permanent basis, it is wholly uncertain what the resulting regime will look like or when it will be in place. It could take the agency considerable time to gather the necessary input and settle on a solution. And for all we know, at the end of that process, EPA might even come to the conclusion that the 2018 Rule already embodies the proper resolution of the issue (or it could reach any of an unknown number of other potential solutions). Regardless, until then, EPA will continue to apply the 2018 Rule. That Rule marks

the consummation of the agency's decisionmaking about the governing framework unless and until it is superseded.

Finally, *any* agency action is *always* subject to displacement by a future rulemaking. If the mere possibility of displacement rendered a governing agency rule non-final for purposes of judicial review, no rule would ever count as final. Our precedents understandably prescribe a contrary approach, under which, as long as an agency has completed its decisionmaking on a challenged rule—even one interim in nature—the rule satisfies the first prong of the finality test. *See Clean Air Council*, 862 F.3d at 6; *Int'l Union*, 823 F.2d at 614–15. It follows that, as both EPA and petitioners agree, the 2018 Rule marks the consummation of the agency's decisionmaking process.

2.

The 2018 Rule also determined legal rights and obligations and gave rise to legal consequences for purposes of the second prong of the finality test. As we have recognized, an agency's suspension of regulatory requirements ordinarily "affects regulated parties' rights or obligations." *Clean Air Council*, 862 F.3d at 7 (internal quotation marks omitted). Here, no party disputes that, to the extent the 2018 Rule suspends the 2015 Rule's HFC listings, the 2018 Rule determines legal rights and obligations and carries legal consequences by giving regulated parties the legal right to replace ozone-depleting substances with HFCs.

EPA and intervenors, though, contend that the 2018 Rule does not determine legal rights and obligations or effect legal consequences. In their view, it was our decision in *Mexichem*, not the 2018 Rule, that suspended the 2015 Rule's HFC listings. According to that account, the 2018 Rule "simply

applies and implements" *Mexichem* and "therefore has no independent legal consequences." EPA Br. 19. That is incorrect.

Our decision in *Mexichem* makes clear that it did not vacate the HFC listings in the 2015 Rule in their entirety. The decision rested on an understanding of EPA's statutory authority to regulate entities' replacement of ozone-depleting substances. We reasoned that an entity "replaces" an ozone-depleting substance when it switches to a substitute substance, and that EPA's statutory authority thus extends only to regulating the initial switch. *See* 866 F.3d at 458–59. And because HFCs are not themselves ozone-depleting substances, we concluded, EPA had no statutory authority to compel an entity already using HFCs to replace them with alternate substitutes. *See id.* We thus held that EPA cannot permissibly apply the 2015 Rule's HFC listings to entities already using HFCs. *Id.* We made no suggestion, though, that EPA cannot apply the 2015 Rule to entities still using ozone-depleting substances. Our decision accordingly did not vacate the 2015 Rule's HFC listings in toto.

To the contrary, the *Mexichem* decision repeatedly evinced our understanding that we were vacating the HFC listings only in part. Four distinct times, we emphasized that we were vacating the 2015 Rule only "to the extent" the Rule requires replacements of HFCs, *id.* at 454, 462, 464, confirming that we otherwise sought to leave the HFC listings intact. Similarly, when discussing EPA's theory that it could apply the 2015 Rule to all parties that had previously used ozone-depleting substances but had since switched to HFCs, we explained that the agency had not met the necessary requirements to allow retroactive rulemaking and that, "[u]nless and until" it did so, "EPA may not apply the 2015 Rule to require manufacturers to replace one non-ozone-depleting substitute with another

substitute." *Id.* at 462. Again, the straightforward implication of our statement is that EPA may apply the 2015 Rule in other circumstances.

We echoed the same understanding when, after concluding that EPA lacked statutory authority to apply the 2015 Rule's listings to entities that had already switched to HFCs, we went on to consider—and reject—the manufacturers' various arguments that "EPA's decision to remove HFCs from the list of safe substitutes was arbitrary and capricious." *Id.* at 462–63. That entire discussion would have been wholly unnecessary had we believed that the first part of our opinion (about EPA's statutory authority) meant we were vacating the 2015 HFC listings in their entirety.

In short, our decision in *Mexichem* reinforced throughout an intention only to forbid EPA from applying the 2015 Rule's HFC listings to a discrete set of regulated parties (those that had already switched from ozone-depleting substances to HFCs), not to set aside the 2015 Rule's HFC listings in their entirety. The 2018 Rule goes further than *Mexichem* by instituting a complete vacatur of the 2015 Rule's HFC listings. And vacating those listings has the effect of suspending regulatory requirements, which qualifies as determining legal rights or obligations and carrying legal consequences for purposes of the second finality prong.

EPA and intervenors contend that the 2018 Rule nonetheless has no independent legal effect because "the aspect of the 2015 Rule that exceeded EPA's authority" per *Mexichem* "flow[s] from the exact same regulatory text" as "the aspect that did not." EPA Br. 24. According to EPA and intervenors, "[t]he listings in the 2015 Rule are thus one, integral action that" must "necessarily stand or fall as a whole because there are no components to the regulatory text that can be treated

independently and severed." *Id.* (internal quotation marks omitted). Therefore, they argue, even if the *Mexichem* court intended to invalidate the 2015 Rule's HFC listings only in part, the decision necessarily had the effect of invalidating those listings in their entirety because there is no discrete, severable text in the listings that could be struck to implement the court's intended partial vacatur.

EPA errs in focusing on the question whether the HFC listings contained discrete, severable text that *Mexichem* could have struck to implement a partial vacatur. It is a routine feature of severability doctrine that a court may invalidate only some applications even of indivisible text, so long as the "valid applications can be separated from invalid ones." Fallon et al., Hart & Wechsler's: The Federal Courts and the Federal System 170 (7th ed. 2015). As the Supreme Court has explained, when a court encounters statutory or regulatory text that is "invalid as applied to one state of facts and yet valid as applied to another," it should "try to limit the solution to the problem" by, for instance, enjoining the problematic applications "while leaving other applications in force." *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328–29 (2006) (citation omitted) (statute); *see Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173, 195–96 (1999) (regulation). Otherwise, a court would be compelled to grant facial relief in any successful as-applied challenge to a statutory or regulatory provision. That of course is not the law.

Here, the *Mexichem* court followed the Supreme Court's guidance to "limit the solution to the problem" by vacating the 2015 Rule's HFC listings only as applied to entities that EPA lacks authority to regulate (those who had already switched from ozone-depleting substances to HFCs), leaving the listings intact as applied to other entities (those who had not). And in vacating only certain applications of the 2015 Rule without

regard to whether the regulatory text is divisible in a corresponding way, the *Mexichem* court acted in accordance with our precedents.

Consider, in that regard, our decision in *National Corn Growers Ass'n v. EPA*, 613 F.3d 266 (D.C. Cir. 2010). There, we considered an EPA regulation that revoked all "tolerances" (i.e., permissible residues in food) of the pesticide carbofuran, thereby effectively banning use of carbofuran in food for human consumption. *Id.* at 270. We vacated EPA's rule as applied to imported foods but left the rule in place as applied to food produced domestically. *See id.* at 275. And we did so without pausing to examine whether the regulatory text was divisible in a manner corresponding to our partial vacatur. The pertinent text in fact was not divisible in that way: it revoked "all of the existing tolerances for residues of carbofuran," making no reference to—and drawing no distinction between—import and domestic tolerances. Carbofuran; Final Tolerance Revocations, 74 Fed. Reg. 23,046–23,052 (May 15, 2009). We nonetheless "vacate[d] EPA's final rule" only "to the extent it revoked the import tolerances for carbofuran," 613 F.3d at 275, and we rejected challenges to the rule's application to domestic tolerances, *id.* at 272–74.

In *Mexichem*, we similarly did not engage in any express severability analysis about the text of the 2015 Rule. Rather, the decision makes clear its intention to separate unlawful applications of the 2015 HFC listings from lawful ones, and to vacate the 2015 Rule only as to the former. If EPA disagreed with *Mexichem*'s invalidation only of certain applications because the agency believed the 2015 Rule's HFC listings should be treated as an inseverable whole, *see Carlson v. Postal Regulatory Comm'n,* 938 F.3d 337, 351 (D.C. Cir. 2019); *MD/DC/DE Broad. Ass'n v. FCC,* 236 F.3d 13, 23 (D.C. Cir. 2001), the agency could have sought a full (rather than partial)

vacatur of the rule in a petition for rehearing. Indeed, our court routinely entertains rehearing petitions about the appropriate scope of relief. *See, e.g.*, *MD/DC/DE Broad. Ass'n v. FCC*, 253 F.3d 732 (D.C. Cir. 2001); *Davis Cty. Solid Waste Mgmt. v. EPA*, 108 F.3d 1454, 1455 (D.C. Cir. 1997) (per curiam); *Virginia v. EPA*, 116 F.3d 499 (D.C. Cir. 1997) (per curiam). But EPA did not do so.

The upshot is that, after *Mexichem*, the 2015 Rule's HFC listings remained applicable to the class of regulated entities that continued to use ozone-depleting substances. The 2018 Rule, by suspending the HFC listings as applied to that group of entities, changed those parties' legal rights and obligations from the status quo established by *Mexichem*. And because the 2018 Rule meets both prongs of the *Bennett* test for finality, we have jurisdiction to consider the petitions for review before us in this case.

III.

We now proceed to assess petitioners' challenges to EPA's adoption of the Rule. Petitioners contend that the 2018 Rule was a legislative rule and was thus improperly promulgated without the required notice-and-comment procedures. They further contend that the Rule is arbitrary and capricious. We agree with the first of those arguments and therefore have no occasion to consider the second one.

The Clean Air Act calls for EPA to employ notice-and-comment procedures whenever it engages in the "promulgation or revision of regulations under" Title VI. 42 U.S.C. § 7607(d); *see* 5 U.S.C. § 553. That requirement, though, applies to the promulgation only of legislative rules, not interpretive rules. *See Am. Mining Congress v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1108–12 (D.C. Cir. 1993). Because the 2018 Rule

was not promulgated via notice and comment, the pivotal question is whether the rule is legislative or interpretive.

The "line between interpretive and legislative rules" is "fuzzy" and "enshrouded in considerable smog." *Id.* at 1108 (citation omitted). Our decisions, however, set out a basic taxonomy. A "legislative rule" is one that has "legal effect" or, alternately, one that an agency promulgates with the "intent to exercise" its "delegated legislative power" by speaking with the force of law. *Id.* at 1109, 1112 (internal quotation marks omitted). An "interpretive rule," meanwhile, is one that "derive[s] a proposition from an existing document," such as a statute, regulation, or judicial decision, "whose meaning compels or logically justifies the proposition." *Catholic Health Initiatives v. Sebelius*, 617 F.3d 490, 494 (D.C. Cir. 2010) (citation omitted). An interpretive rule, instead of creating legal effects, thus puts the public on notice of *pre-existing* legal obligations or rights. Here, the 2018 Rule has independent legal effect beyond that compelled by *Mexichem* and reflects EPA's intent to exercise its delegated legislative power.

First, while EPA now describes the 2018 Rule as merely interpretive, the Rule itself evinces the agency's intent to speak with the force of law. EPA concluded that "attempting to draw the distinctions made by the court [in *Mexichem*] would present practical difficulties," that those distinctions were not reflected in the text of the 2015 Rule, and that *Mexichem*'s partial vacatur had generated "substantial confusion and uncertainty" among regulated entities. 83 Fed. Reg. 18,433–35. EPA thus relied "on its expertise . . . and its understanding of the 2015 Rule" to conclude that the 2015 HFC listings should be suspended "in their entirety." *Id* at 18,435. That manner of action—identifying a practical problem ostensibly created by a judicial decision and relying on agency expertise to put forward a new and different resolution—is quintessentially legislative,

manifesting EPA's intent to exercise its delegated legislative power and speak with the force of law.

The 2018 Rule has the force of law because it suspends the 2015 Rule's HFC listings for a class of regulated entities (those continuing to use ozone-depleting substances) to whom the 2015 Rule still applied after *Mexichem*. Suspension of a rule is "tantamount to amending or revoking a rule," *Clean Air Council*, 862 F.3d at 6, and "an agency action which has the effect of suspending a duly promulgated regulation" (like the 2015 Rule) "is normally subject to APA rulemaking requirements," including notice-and-comment procedures. *Envtl. Def. Fund, Inc. v. Gorsuch*, 713 F.2d 802 (D.C. Cir. 1983). Indeed, because the 2018 Rule had the effect of amending what is undisputedly a legislative rule (the 2015 Rule), it too is a legislative rule subject to notice-and-comment obligations: an "amendment to a legislative rule must itself be legislative." *Sierra Club v. EPA*, 873 F.3d 946, 952 (D.C. Cir. 2017).

Our dissenting colleague, while agreeing that the 2018 Rule constitutes final agency action, believes that the Rule is interpretive rather than legislative, such that notice-and-comment procedures should be inapplicable. But even assuming an agency rule can determine "legal rights and obligations" or carry "legal consequences" (so as to amount to final agency action) but still lack "legal effects" (so as to fall short of a legislative rule), *see Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 635 (D.C. Cir. 2019), the 2018 Rule is not such a needle-threading rule. The 2018 Rule did not merely interpret *Mexichem*'s partial vacatur of the 2015 Rule. The 2018 Rule instead expanded *Mexichem*'s partial vacatur into a full vacatur, revoking those applications of the 2015 Rule's bar on use of HFCs that had remained standing after *Mexichem*.

Our colleague suggests that, insofar as *Mexichem* vacated only certain applications of the 2015 Rule while leaving other applications standing, our decision in that case disregarded the regulatory history (specifically, a previous EPA rule referred to as the "1994 Framework Rule"), and reached a resolution inconsistent with severability principles. *See* Dissenting Op. 4, 11–15. As explained, however, *Mexichem*'s partial vacatur of the 2015 Rule—its invalidation only of certain applications without examining the severability of the regulatory text— cohered with our precedents. *See National Corn Growers*, 613 F.3d 266; *see also Illinois Commerce Comm'n v. ICC*, 776 F.2d 355, 358–60 (D.C. Cir. 1985).

At any rate, the question for us is not whether *Mexichem*'s partial vacatur of the 2015 Rule was correct at the time, or if we should have examined the regulatory text's severability in that opinion. *Mexichem*'s partial vacatur, whether correct or incorrect, is now final. And the question for us is whether EPA in the 2018 Rule merely interpreted *Mexichem*'s partial vacatur in the manner of an interpretive rule or instead altered the decision's legal effect in the manner of a legislative rule.

The agency did the latter, transforming *Mexichem*'s partial vacatur into an across-the-board invalidation of the 2015 Rule's HFC listings. The agency in fact affirmatively declined "to draw the distinctions made by the court" in *Mexichem*. 83 Fed. Reg. 18,434. And the agency expressly "recognize[d] that the court vacated the 2015 Rule [only] 'to the extent that' it requires manufacturers to replace HFCs" and that the court had otherwise "rejected the arbitrary and capricious challenges to the HFC listing changes." *Id.* at 18,435. But the agency nonetheless opted to "implement the court's vacatur by *treating it* as striking the HFC listing changes in the 2015 Rule in their entirety." *Id.* (emphasis added). In other words, EPA "treated" the decision as having a legal effect—full vacatur—that the

decision disclaimed. That is a legislative rule subject to notice-and-comment procedures.

Intervenors submit that the agency's failure to abide by notice-and-comment requirements amounts to harmless error. *See* Intervenors Br. 34–36. Of course, though, the entire premise of notice-and-comment requirements is that an agency's decisionmaking may be affected by concerns aired by interested parties through those procedures. For that reason, we have "not been hospitable to government claims of harmless error in cases in which the government . . . fail[ed] to provide notice." *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1109 (D.C. Cir. 2014). And we have found cases "in which a government agency seeks to promulgate a rule by another name—evading altogether the notice and comment requirements"—to be the "most egregious" breaches of notice-and-comment obligations. *Id.*

This is such a case. EPA wholly failed to provide petitioners (or any other interested parties) the opportunity to comment on the best way to implement the distinctions drawn by our court in *Mexichem*. Indeed, the very fact that EPA plans to engage in full notice-and-comment rulemaking in the future when developing a permanent replacement for the 2018 Rule suggests that the agency, too, believes that comments from interested parties may provide valuable input on the matter. EPA's failure to abide by notice-and-comment procedures when promulgating the 2018 Rule then cannot be considered harmless.

For substantially similar reasons, EPA's error requires us to vacate the 2018 Rule. In general, "vacatur is the normal remedy" for a procedural violation, although we may remand to the agency without vacatur based on "the seriousness of the order's deficiencies and the likely disruptive consequences of

vacatur." *Allina Health Servs.*, 746 F.3d at 1110 (internal quotation marks omitted). Here, both considerations counsel in favor of vacatur. First, "[f]ailure to provide the required notice and to invite public comment—in contrast to the agency's failure . . . adequately to explain why it chose one approach rather than another for one aspect of an otherwise permissible rule—is a fundamental flaw that normally requires vacatur of the rule." *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 199 (D.C. Cir. 2009) (internal quotation marks omitted). And second, neither EPA nor intervenors have identified any serious disruptive consequences of vacatur, resting instead on the regulatory uncertainty that typically attends vacatur of any rule. *See* EPA Br. 38–39.

None of this means that EPA was powerless to act in the face of what it perceived to be practical difficulties and regulatory uncertainty engendered by *Mexichem*'s partial vacatur. First, as noted, EPA could have petitioned the *Mexichem* court for rehearing, explaining that it believed the HFC listings were inseverable and asking the court to vacate the 2015 Rule in full. Second, EPA could have issued an interpretive rule (without engaging in notice and comment) to explain how it understood the *Mexichem* decision's partial vacatur to apply to certain gray areas identified in the 2018 Rule. *See* 5 U.S.C. § 553(b); 83 Fed. Reg. 18,434–35. Third, EPA could have exercised its enforcement discretion to focus its enforcement efforts on entities still subject to regulation after *Mexichem*, or it could have resolved difficult questions through case-by-case adjudications, *cf. Blanca Tel. Co. v. FCC*, 743 F.3d 860, 867 (D.C. Cir. 2014). Finally, EPA perhaps could have attempted to invoke the good-cause exception to promulgate an interim legislative rule without notice and comment, pending its undertaking a full legislative rulemaking. *See* 5 U.S.C. § 553(b).

We do not mean to prejudge the ultimate permissibility or efficacy of any of those options.  Rather, we mean only to highlight that EPA had several options by which it could have attempted to address the perceived difficulties associated with implementing our decision in *Mexichem*.  But the one option EPA could not permissibly pursue was the one it chose: promulgating a legislative rule without abiding by notice-and-comment requirements and without invoking any exception to those obligations.

\* \* \* \* \*

For the foregoing reasons, we grant the petitions for review, vacate the 2018 Rule, and remand to EPA for further proceedings consistent with this opinion.

*So ordered.*

RAO, *Circuit Judge*, dissenting: In 2018, the Environmental Protection Agency issued a guidance document to provide clarity and regulatory certainty for stakeholders affected by EPA's 2015 Rule regulating hydrofluorocarbons ("HFCs") and our related decision in *Mexichem Fluor, Inc. v. EPA*, 866 F.3d 451 (D.C. Cir. 2017). The majority classifies the 2018 Guidance as a final legislative rule that should have been promulgated through notice and comment procedures. I agree that the 2018 Guidance is a final agency action subject to our review. Unlike the majority, however, I would classify the 2018 Guidance as an interpretive rule that did not create new rights or obligations and did no more than articulate the EPA's view of what was required by *Mexichem* in the "near term" and pending further rulemaking. Because the 2018 Guidance was an interpretive rule, notice and comment was not necessary. In addition, EPA's decision to treat *Mexichem* as vacating the entire 2015 Rule was not arbitrary and capricious because it was effectively compelled by *Mexichem*. In characterizing the 2018 Guidance as a legislative rule, the majority misinterprets the EPA's regulatory framework and unravels *Mexichem*'s mandate. I respectfully dissent.

I.

The dispute in this case turns on the interplay between *Mexichem* and the EPA's implementation of that decision in the 2018 Guidance. To understand the scope and consequences of the 2018 Guidance requires analyzing "the idiosyncratic regime of statutes and regulations that govern it." *Cal. Communities Against Toxics v. EPA*, 934 F.3d 627, 632 (D.C. Cir. 2019). I begin with the original regulatory framework EPA promulgated in 1994, because this provides essential context for understanding the 2015 Rule, *Mexichem*, and the 2018 Guidance.

As the majority explains, the United States ratified the Montreal Protocol in 1987 to help address the deterioration of

the ozone layer. After ratification, Congress amended the Clean Air Act in 1990 by adding Title VI. *See* 42 U.S.C. § 7671 *et seq*. The amendments require manufacturers and end-users to phase out various substances that deplete the ozone layer. *See Mexichem*, 866 F.3d at 454. For our purposes, the most relevant provision is Section 612(c), which authorizes EPA to regulate which chemicals can be used "to replace" ozone-depleting substances. 42 U.S.C. § 7671k(c).[1]

In 1994, the EPA promulgated a framework explaining how the EPA will regulate HFCs and other substitutes for ozone-depleting substances. *See* Protection of Stratospheric Ozone, 59 Fed. Reg. 13,044 (Mar. 18, 1994) ("1994 Framework Rule"). As relevant here, the Framework Rule specified that when a chemical is listed as an unacceptable substitute, no person can continue to use it, even if that person has already stopped using ozone-depleting substances. *Id*. at 13,148 ("No person may use a substitute after the effective date of any rulemaking adding such substitute to the list of unacceptable substitutes."). For more than 20 years, EPA interpreted "replace" under Section 612(c) to apply on an ongoing basis, each time a person uses the substitute. *Id*. at 13,048. Under this interpretation, if EPA reclassifies an acceptable substitute as unacceptable, no one may use it, even persons who had previously stopped using ozone-depleting substances. *Id*. ("[O]nce EPA identifies an unacceptable substitute, any future use of such substitute is prohibited. Under any other interpretation, EPA could never effectively prohibit the use of any substitute, as some user could always start to use

---

[1] The full text reads: "[T]he Administrator shall promulgate rules under this section providing that it shall be unlawful to replace any class I or class II substance with any substitute substance which the Administrator determines may present adverse effects to human health or the environment, where the Administrator has identified an alternative." 42 U.S.C. § 7671k(c).

it prior to EPA's completion of the rulemaking required to list it as unacceptable.").

The EPA initially listed HFCs as acceptable substitutes for ozone-depleting substances. *See, e.g.,* Protection of Stratospheric Ozone: Listing of Substitutes for Ozone-Depleting Substances, 68 Fed. Reg. 4,004, 4,005–06 (Jan. 27, 2003). In 2015, the agency changed course and listed HFCs as unacceptable because they have a significant effect on global warming. *See* Protection of Stratospheric Ozone: Change of Listing Status for Certain Substitutes Under the Significant New Alternatives Policy Program, 80 Fed. Reg. 42,870 (July 20, 2015) ("2015 Rule"). The 2015 Rule applied to everyone, including people who had already stopped using ozone-depleting substances and had "replaced" them with HFCs. As EPA emphasized, this consequence followed directly from the 1994 Framework Rule. *Id.* at 42,936–37.

In *Mexichem*, we rejected EPA's longstanding interpretation that the term "replace" encompasses the continued use of a substitute by people who have already stopped using ozone-depleting substances. We explained that EPA's "reading stretche[d] the word 'replace' beyond its ordinary meaning." *Mexichem*, 866 F.3d at 458. We held that the EPA has no authority under Section 612(c) to prohibit the use of HFCs by people who adopted them as a substitute for ozone-depleting substances before the 2015 Rule went into effect. *See* 866 F.3d at 456–61. As we explained, a party "replaces" an ozone-depleting substance when it transitions to an acceptable substitute; once it does that, the replacement is over. Because people who have already made the switch to HFCs are no longer using ozone-depleting substances, the EPA cannot require them to stop using HFCs—at least not under Section 612(c), which regulates only the initial replacement of ozone-depleting substances. Indeed, we emphasized that the

EPA's "boundless interpretation" "border[ed] on the absurd" because it would give the agency "indefinite authority." *Id.* at 459. While we rejected EPA's interpretation of "replace," we held that EPA's decision to list HFCs as unacceptable substitutes was, as a general matter, not arbitrary and capricious. *See id.* at 462–64. As a remedy, we "vacate[d] the 2015 Rule to the extent it require[d] manufacturers to replace HFCs with a substitute substance." *Id.* at 464.

After *Mexichem*, the 1994 Framework Rule remains in effect, although its reasoning was substantially undermined by our opinion. The majority overlooks this fact—perhaps because *Mexichem* never discusses the 1994 Rule and suggests in passing that the EPA's interpretation of "replace" was "new" to the 2015 Rule. *See* 866 F.3d at 458. The 2015 Rule, however, did not articulate a "new" interpretation. Rather, before *Mexichem*, the EPA consistently maintained that it could prohibit the use of substitutes like HFCs regardless of whether a person had already made the substitution before the regulation went into effect.

In the wake of *Mexichem*, regulated entities were unsure of the practical consequences of our remedy and "experience[d] substantial confusion and uncertainty regarding the meaning of the vacatur in a variety of specific situations." *See* Protection of Stratospheric Ozone: Notification of Guidance and a Stakeholder Meeting Concerning the Significant New Alternatives Policy (SNAP) Program, 83 Fed. Reg. 18,431, 18,434 (Apr. 27, 2018) ("2018 Guidance"). In the 2018 Guidance, the EPA sought to clarify how it would implement *Mexichem*. In doing so, EPA reiterated that the 1994 Framework Rule—not the 2015 Rule—required that "[n]o person may use a substitute after the effective date of any rulemaking adding such substitute to the list of unacceptable substitutes." *See id*. at 18,433 (quoting 40 C.F.R. § 82.174 (the

1994 Framework Rule)). The 2018 Guidance emphasized that prior to *Mexichem*, the 2015 Rule had operated exactly "like all other actions EPA has taken implementing the 1994 Framework Rule over the last quarter-century"—namely to require everyone to stop using the unacceptable substance, irrespective of whether they had switched to the substitute prior to the listing. *Id.* In other words, the agency maintained that the interpretation invalidated by *Mexichem* originated in the 1994 Framework Rule.

In the 2018 Guidance, EPA recognized that *Mexichem* vacated "the 2015 Rule 'to the extent that' it requires manufacturers to replace HFCs." *Id.* at 18,435. EPA proceeded to analyze how to implement this directive with respect to the 2015 Rule, which "is comprised solely of tables listing … certain substitutes for specific end-uses." *Id.* at 18,434. While *Mexichem* suggests that the 2015 Rule could apply to people still using ozone-depleting substances, the tables in the Rule do not "draw a distinction between persons using HFCs and those using an [ozone-depleting substance]." *Id.* The agency concluded that the "regulations as currently written do not provide the distinctions that would be necessary to accommodate the letter of the court's vacatur." *Id.* After all, under the 1994 Framework Rule, *every* listing necessarily applies to current and future users of a given substance. *See id.* at 18,435 ("[T]the *listing* of HFC's as unacceptable, or acceptable subject to use restrictions, *is* the means by which the 2015 Rule 'require[d] manufacturers to replace HFCs with a substitute substance.'"). EPA explained that "[t]he narrower language used by the court does not exist in either the 2015 Rule or the 1994 Framework Rule; nor do the distinctions discussed above emerge when those two rules are read together." *Id.* at 18,434. Indeed, the EPA emphasized that to implement a partial vacatur would require it "to drastically rewrite the 2015 Rule," which "would not be appropriate to

undertake … without undergoing notice and comment rulemaking." *Id.* at 18,435.

Pending additional notice and comment rulemaking, EPA determined that the only way to implement *Mexichem* and to provide guidance to regulated entities was to read our opinion as vacating the HFC listing in its entirety. *See id.* EPA thus interpreted and implemented *Mexichem*'s vacatur in the only way it believed permissible given the indivisible listings in the 2015 Rule and the interpretation set forth in the 1994 Framework Rule. With this more complete regulatory context, I turn to the appeal before us.

## II.

We face two interrelated, yet distinct, inquiries in this case. First, we must decide whether the EPA's action was final, a question about the availability of judicial review. *See* 5 U.S.C. § 704. Second, if the action was final, we must determine whether it is a legislative or interpretive rule, a question about the procedures the agency must follow. As our court has recently observed, "although all legislative rules are final, not all final rules are legislative, and the finality analysis is therefore distinct from the test for whether an agency action is a legislative rule." *Cal. Communities Against Toxics*, 934 F.3d at 631; *cf. Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014) ("[E]ven interpretive rules may be subject to pre-enforcement judicial review.").[2]

---

[2] As the majority frames these questions, the standards for finality and legislative rules are essentially the same. Indeed, the majority leaves open the possibility that the category of final, interpretive rules may be a conceptual null set. Maj. Op. 23. This has no support in the APA and is foreclosed by Supreme Court precedent. *See U.S.*

The majority conflates aspects of these two standards. For the purposes of this case's finality inquiry, we need ask only whether the agency's interpretation of *Mexichem* had "direct and appreciable legal consequences." *Bennett v. Spear*, 520 U.S. 154, 178 (1997). While I agree with the majority that the EPA's action is final under this standard, it does not matter whether the 2018 Guidance created new legal obligations. A final agency action can include interpretive rules that merely state the agency's interpretation of a statute, regulation, or judicial decision.

The question of whether the 2018 Guidance created new legal obligations is, however, relevant to the second inquiry— whether this is legislative rule. Here I part ways with the majority. Because the 2018 Guidance merely interpreted the necessary consequences of our vacatur in *Mexichem*, the Guidance is a final, interpretive rule that was reasonable and not arbitrary and capricious.

## A.

We have jurisdiction under the Clean Air Act to review the 2018 Guidance only if it was a "final action." *See* 42 U.S.C. § 7607(b)(1). The term "final action" "is synonymous with the term 'final agency action' as used in Section 704 of the" Administrative Procedure Act ("APA"). *Sierra Club v. EPA*, 873 F.3d 946, 951 (D.C. Cir. 2017). To determine whether an agency action is final, we apply the two-prong test set forth in *Bennett v. Spear*: the action must both "mark the consummation of the agency's decisionmaking process," and it "must be one by which rights or obligations have been determined, or from which legal consequences will flow." 520 U.S. 154, 178 (1997) (quotation marks omitted). The parties

---

*Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1815 (2016) (observing that the Court frequently reviews interpretive rules).

and the majority all agree that the 2018 Guidance reflects the consummation of the agency's decisionmaking process, Maj. Op. 12, so I focus on the second prong.

The central dispute is whether an agency action can have a sufficiently concrete legal effect for the purposes of *Bennett*'s second prong if it simply interprets a legal obligation that stems from a different legal source. The majority focuses on whether it was "*Mexichem*, not the 2018 Rule, that suspended the 2015 Rule's HFC listings." Maj. Op. 16. In the finality context, however, it is unnecessary to determine whether *Mexichem* directs suspension of the 2015 Rule or whether the 2018 Guidance independently creates that result. Under *Bennett*, a final action is "one by which rights or obligations have been determined, or from which legal consequences will flow." 520 U.S. at 178 (quotation marks omitted). The legal consequences do not necessarily have to flow from the rule itself. If they did, an interpretive rule could never be final and reviewable, and we have explicitly held that "even interpretive rules may be subject to pre-enforcement judicial review." *Nat'l Mining Ass'n*, 758 F.3d at 251; *see also U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1815 (2016) (observing that the Court frequently reviews agency decisions that simply "give notice of how the [agency] interpret[s] the relevant statute" (quotation marks omitted)) (discussing *Frozen Food Express v. United States*, 351 U.S. 40, 41–44 (1956)).[3]

---

[3] The Supreme Court made clear in *Hawkes* that interpretive rules can be final actions subject to review, which supersedes any suggestion in *Association of Flight Attendants-CWA, AFL-CIO v. Huerta*, that interpretive rules are not reviewable. *See* 785 F.3d 710, 713 (D.C. Cir. 2015) ("The guidance offered in Notice N8900.240 reflects nothing more than a statement of agency policy or an interpretive rule. The Notice is therefore unreviewable.").

An interpretive rule by definition does not create new obligations, but instead interprets existing legal obligations under statutes, regulations, and judicial decisions. To be final, a rule simply has to determine which rights a party has under the law, and a rule determines rights or obligations if its impact is "sufficiently direct and immediate" and if it will have a "direct effect" on "day-to-day" affairs. *Abbott Labs. v. Gardner*, 387 U.S. 136, 152 (1967). Put slightly differently, "[t]he core question is … whether the result of th[e] process is one that will directly affect the" regulated parties. *Franklin v. Mass.*, 505 U.S. 788, 797 (1992); *accord Dalton v. Specter*, 511 U.S. 462, 470 (1994).

The 2018 Guidance was an action "by which rights or obligations have been determined." *Bennett*, 520 U.S. at 178 (quotation marks omitted). In *Mexichem*'s aftermath, there was considerable confusion across several industries as to the meaning of the court's remedy. *See* 83 Fed. Reg. at 18,434. The 2018 Guidance explained how the EPA would implement *Mexichem*. The agency's interpretation directly affected regulated parties: "EPA will not apply the HFC use restrictions or unacceptability listings in the 2015 Rule for any purpose." *Id.* at 18,433. Thus, irrespective of whether the obligations followed from our *Mexichem* decision or an independent decision by EPA, the 2018 Guidance had an immediate and practical impact and thus was a final agency action subject to our review.

## B.

The finality of the 2018 Guidance, however, does not answer the question of whether it is a legislative or interpretive rule. This question turns on whether the 2018 Guidance merely articulated the agency's understanding of *Mexichem*'s legal implications, or whether the agency went further than

*Mexichem* and thus created new legal obligations. If the 2018 Guidance was an interpretive rule, the EPA's decision to skip notice and comment was perfectly acceptable. *See Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995) ("Interpretive rules do not require notice and comment."); *see also* 5 U.S.C. § 553(b)(3)(A) ("Except when notice or hearing is required by statute, this subsection [about notice and comment] does not apply—(A) to interpretative rules."). On the other hand, if the 2018 Guidance was a legislative rule that brought about a substantive change to the agency's Title VI regulations, then the procedures used were inadequate. *See* 42 U.S.C. § 7607(d)(1)(I) (requiring notice and comment rulemaking for regulations promulgated under Title VI).

To determine whether a rule is legislative, we ask whether the agency is exercising its statutory rulemaking authority to promulgate rules that have the force of law and "impose legally binding obligations or prohibitions." *Nat'l Mining Ass'n*, 758 F.3d at 251; *see also Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1109 (D.C. Cir. 1993). Interpretive rules, on the other hand, "derive a proposition from an existing document whose meaning compels or logically justifies the proposition." *Catholic Health Initiatives v. Sebelius*, 617 F.3d 490, 494 (D.C. Cir. 2010). "[T]he critical feature of interpretive rules is that they are issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1204 (2015) (quotation marks omitted). Thus, legislative rules impose new legally binding requirements, whereas interpretive rules set forth the agency's explanation of existing legal requirements. Evaluating EPA's action in light of the *Mexichem* remedy as well as the existing regulatory scheme demonstrates that the 2018 Guidance was an interpretive rule.

As the majority recognizes, "EPA could have issued an interpretive rule (without engaging in notice and comment) to explain how it understood the *Mexichem* decision's partial vacatur to apply to certain gray areas identified." Maj. Op. 26. That is precisely what EPA did in the 2018 Guidance when it stated why *Mexichem* compelled a prohibition on the use of HFCs, absent further rulemaking. *Mexichem* held that EPA could not interpret Section 612(c) to require people who had already "replaced" ozone-depleting substances with HFCs to make another replacement. *Mexichem*, 866 F.3d at 459 ("EPA's strained reading of the term 'replace' contravenes the statute and thus fails at *Chevron* step 1."). In addition, our court held that EPA had reasonably chosen to list HFCs as unacceptable substitutes going forward. *Id.* at 462–64. The resulting public confusion and uncertainty stemmed in part from the fact that our court vacated the 2015 Rule "to the extent that" it applied to people who had already switched to HFCs from ozone-depleting substances. Our court remanded to the EPA for further proceedings without conducting a severability analysis or otherwise explaining how to implement the vacatur.

Thus, after *Mexichem*, a practical question remained about how to implement the decision. Recognizing that "the agency cannot remain silent on the implications of the court's vacatur until such time as the agency can complete a notice-and-comment rulemaking," the EPA provided a "near term" interpretation of our decision. 83 Fed Reg. at 18,435. EPA concluded that in light of the 2015 and 1994 Rules, the 2015 HFC listings could not be applied "for any purpose prior to completion of rulemaking." *Id*. Although our remedy in *Mexichem* could arguably be read to suggest some type of partial vacatur, the EPA concluded that "[t]he narrower language used by the court does not exist in [ ] the 2015 Rule." *Id*. at 18,434. According to the EPA, because the Rule is composed of nothing more than tables—tables that did not

make the distinction drawn by our court—the Rule could not be vacated only in part. "[T]he *listing* of HFC's as unacceptable, or acceptable subject to use restrictions, *is* the means by which the 2015 Rule 'require[d] manufacturers to replace HFCs with a substitute substance.'" *See id.* at 18,435 (quoting *Mexichem*, 866 F.3d at 462). Listing HFCs as unacceptable necessarily had the effect our court said went beyond EPA's statutory authority, so there was nothing that could be severed from the listing to separate those who had already switched to HFCs from those who may switch in the future. "Vacating the 2015 Rule 'to the extent' that it imposed that requirement *means* vacating the listings. To apply the court's holding otherwise would be to drastically rewrite the 2015 Rule." *Id.*

The EPA recognized that it could eventually create sublistings for different types of HFC users, but "such additions to the 2015 Rule would require notice-and-comment rulemaking." *Id.* at 18,434. Additional rulemaking would be required not only to address the 2015 Rule's indivisible listings, but also to revisit EPA's interpretation of "replace" in the 1994 Framework Rule, which was never addressed by *Mexichem* and therefore remained on the books, even if its reasoning was substantially undermined. *Id.* Thus, pending further rulemaking, EPA interpreted *Mexichem* as vacating the entire list of HFCs. The majority says that the 2018 Guidance is a legislative rule because the EPA "identif[ied] a practical problem" and "rel[ied] on agency expertise to put forward a new resolution." Maj. Op. 22–23. Yet EPA never suggested it was crafting a practical solution to a new problem. Rather, EPA concluded this was the only course of action that was legally permissible in light of the vacatur in *Mexichem*.

The majority today provides a different interpretation of *Mexichem*, one that rewrites our decision and ignores the

regulatory framework still in place after *Mexichem*. To the extent the majority seeks to provide a severability analysis not provided by *Mexichem*, the majority's conclusion is inconsistent with our regulatory severability precedents and also with the clear vacatur set forth in *Mexichem*. When determining whether a regulation may be severed, the court considers a two-part test. "First, the court must find that 'the agency would have adopted the same disposition regarding the unchallenged portion [of the regulation] if the challenged portion were subtracted.'" *Carlson v. Postal Regulatory Comm'n*, 938 F.3d 337, 351 (D.C. Cir. 2019) (quoting *Sierra Club v. FERC*, 867 F.3d 1357, 1366 (D.C. Cir. 2017)). "Second, the parts of the regulation that remain must be able to 'function sensibly without the stricken provision.'" *Id.* (quoting *Sorenson Commc'ns. Inc. v. FCC*, 755 F.3d 702, 710 (D.C. Cir. 2014)). The "entire rule must be vacated" if severing only the unlawful aspects "would severely distort the [agency's] program and produce a rule strikingly different from any the [agency] has ever considered or promulgated in the lengthy course of these proceedings." *MD/DC/DE Broads. Ass'n v. FCC*, 236 F.3d 13, 23 (D.C. Cir. 2001). Moreover, an agency action should be vacated in its entirety if "[t]he intertwined character of the … component parts gives rise to a substantial doubt that a partial affirmance would comport with the [agency's] intent." *Tel. & Data Sys. Inc. v. FCC*, 19 F.3d 42, 50 (D.C. Cir. 1994).

Here, the lawful and unlawful "parts" of the 2015 Rule were not just "intertwined." *Id.* They stemmed from the exact same listing—indeed, the exact same words. The 2015 Rule's lawful applications could not survive independently when *Mexichem* interpreted the statute in a manner fundamentally at odds with the underlying 1994 Framework Rule. EPA noted in the 2018 Guidance that it plans to consider to what extent the 1994 Framework Rule must be modified through future notice

and comment rulemaking. Until that occurs, however, the majority's solution produces a rule inconsistent with the agency's existing regulatory framework for classifying replacements for ozone-depleting substances.

If the agency had chosen to adopt the majority's interpretation after *Mexichem*, the EPA would have been required to engage in notice and comment rulemaking. In the 2018 Guidance, EPA noted numerous difficult questions raised by our decision in *Mexichem* that the agency planned to address. *See, e.g.*, 83 Fed. Reg. at 18,435–36 (listing the questions the agency plans on considering in the future, including "whether EPA should revisit specific provisions of the 1994 Framework Rule … to establish distinctions between users still using [ozone-depleting substances] and those who have already replaced" them; "[w]hether EPA should distinguish between product manufacturers and other users"; and "[w]hether EPA should clarify when the replacement of an [ozone-depleting substance] occurs: *e.g.*, on a facility-by-facility basis, or on a product-by-product basis"). As the EPA reiterated in the 2018 Guidance, the 2015 Rule functioned the same way as every other listing since 1994: The listing of a substance as unacceptable would apply to everyone manufacturing or using that substance. Because the majority overlooks the existing regulatory framework, it fails to appreciate that notice and comment rulemaking would be required to implement its interpretation of *Mexichem*.

Under the majority's holding, the 2015 Rule will now function differently from every other rule promulgated by EPA under Section 612(c). Instead of following our precedents in the context of regulatory severability,[4] the majority interprets

---

[4] Many of the cases relied on by the majority do not involve severability at all. *See, e.g., Ayotte v. Planned Parenthood of Northern New England*, 546 U.S. 320 (2006); *Greater New Orleans*

what it considers to be our court's "intention" in *Mexichem*. Even though *Mexichem* did not engage in any express severability analysis, the majority concludes that "the decision makes clear its intention to separate unlawful applications of the 2015 HFC listings from lawful ones, and to vacate the 2015 Rule only as to the former." Maj. Op. 20; *see also id*. at 18 ("[O]ur decision in *Mexichem* reinforced throughout an intention only to forbid EPA from applying the 2015 Rule's HFC listings to a discrete set of regulated parties."). Yet *Mexichem* did not enjoin particular applications of the 2015 Rule. Nor did it hold the regulation unlawful as applied to specific parties. Nor did it remand without vacatur for the EPA to determine how to apply our holding.

Instead, our court repeatedly stated that it was *vacating* the 2015 Rule insofar as it applies to people who have already switched to HFCs. *See Mexichem*, 866 F.3d at 462. To vacate is to do more than enjoin or modify; it is to invalidate. Not only did we vacate the Rule, we said that by promulgating it, the EPA exceeded its statutory authority to a degree that "border[ed] on the absurd." *Id.* at 459.

As EPA explained, "The court clearly intended to vacate the 2015 Rule to some 'extent.'" 83 Fed Reg. at 18,434. A different remedy—for instance, one enjoining particular

---

*Broad. Ass'n v. United States*, 527 U.S. 173 (1999). Relatedly, the majority claims *National Corn Growers v. EPA* is relevant because the court vacated a rule "to the extent" it applied to imports, even though the rule in question did not draw a distinction between imports and other goods. Maj. Op. 20. (citing 613 F.3d 266, 275 (D.C. Cir. 2010)). That case also failed to address severability. While *National Corn Growers*, like *Mexichem*, vacated a rule "to the extent" it had unlawful applications, the case said nothing about the interpretive question that necessarily followed—namely, what it means to vacate a rule to that extent.

applications—would have been inconsistent with the question presented in *Mexichem*, which was "whether Section 612 of the Clean Air Act authorizes the 2015 Rule." *Id.* at 456. The question presented did not concern the application of the 2015 Rule to particular persons, but instead raised a challenge to the 2015 Rule as a whole.

Nothing in *Mexichem* suggested that EPA could use enforcement discretion to implement our holding that EPA's interpretation exceeded the authority in Section 612(c).[5] Today the majority chooses to "sever" the 2015 Rule, not by vacating as *Mexichem* directed, but by rewriting the Rule to apply to a subset of regulated entities. Under the majority's interpretation, not a single word of the 2015 Rule is vacated; instead, the Rule will apply as written in some cases but not others. *See* Maj. Op. 21 ("[A]fter *Mexichem*, the 2015 Rule's HFC listings remained applicable to the class of regulated entities that continued to use ozone-depleting substances."). As a formal matter, the text of the 2015 Rule remains exactly the same. Yet as a practical matter, it must be read with a judicial asterisk, directing the agency to execute the 2015 Rule in a manner at odds with both

---

[5] The majority suggests enforcement discretion as an alternative for implementing *Mexichem*. Maj. Op. 26. To permit an agency to implement a partial vacatur through enforcement discretion—thus leaving the offending rule on the books—undermines this court's authority and produces further uncertainty. We should encourage agencies to distinguish between regulated parties through clear interpretive guidance, rather than through ad hoc discretion. For similar reasons, EPA should be wary of the majority's suggestion to attempt using the good-cause exception for interim legislative rules, Maj. Op. 26, another limited regulatory practice this court has cautioned against abusing. *See Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012) ("We have repeatedly made clear that the good cause exception is to be narrowly construed and only reluctantly countenanced." (quotation marks omitted)).

the plain meaning and EPA's existing regulatory framework. By contrast, the EPA's 2018 Guidance is consistent with *Mexichem*, the text and structure of the 2015 Rule, and other regulations under Section 612(c). I would therefore hold that the 2018 Guidance was an interpretive rule for which no notice and comment was required.

## C.

The petitioners also argue that the EPA's decision to delist HFCs was arbitrary and capricious. The majority does not reach this issue because it concludes that the 2018 Guidance was a legislative rule and therefore must be vacated because the EPA did not follow notice and comment procedures. Because I classify the 2018 Guidance as an interpretive rule, I proceed to explain why petitioners' arbitrary and capricious challenge lacks merit.

The APA mandates that the federal courts "hold unlawful and set aside agency action, findings and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). We must ask whether the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action[,] … whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) ("One of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions.").

The petitioners argue that the EPA's analysis was arbitrary and capricious because it did not "show that there are good reasons for the new policy," NRDC Br. at 36 (quoting *Encino*

*Motorcars, LLC,* 136 S. Ct. at 2126), and because it failed to account for the contribution of additional HFCs to "climate change or its attendant harms." *Id.* at 40. An action is arbitrary and capricious, however, only if the agency failed to consider "the relevant data." *State Farm Mut. Auto. Ins.*, 463 U.S. at 43. We look to "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error." *Marsh v. Ore. Nat. Res. Council*, 490 U.S. 360, 378 (1989). The petitioners essentially argue the EPA should have addressed policy considerations. Policy considerations, however, were not relevant to interpreting *Mexichem*, and therefore EPA was not required to consider them. *See Black Citizens for a Fair Media v. FCC*, 719 F.2d 407, 431 n.15 (D.C. Cir. 1983) (explaining that agencies can "ignore those factors it considers irrelevant to the statutory scheme"); *TransCanada Pipelines Ltd. v. FERC*, 878 F.2d 401, 413 (D.C. Cir. 1989) ("FERC acknowledged this evidence and ignored it as irrelevant. We agree that this evidence, by itself, fails to contradict FERC's [ ] theory." (citation omitted)).

As discussed, the 2018 Guidance did nothing more than interpret *Mexichem*, and EPA's interpretation properly implemented our court's mandate. In interpreting our opinion, it simply would not have been relevant to consider what environmental impacts our decision may have had. The EPA could not choose to disregard our mandate because it thought a different outcome was better on policy grounds. An agency does not act arbitrarily or capriciously when it takes an action that is required by law. *See US Magnesium, LLC v. EPA*, 630 F.3d 188, 193 (D.C. Cir. 2011) (holding that an agency's action could not have been arbitrary or capricious because the agency did not have discretion to adopt a different choice); *Fitts v. Fed. Nat. Mortg. Ass'n*, 236 F.3d 1, 6 (D.C. Cir. 2001) (explaining that the exercise of agency "discretion" is necessary to "justify the application of arbitrary and capricious review").

19

Ultimately, the petitioners' argument that the EPA should have given more reasons for its "new policy" is premised on their view that the 2018 Guidance was a legislative rule that created new obligations. Because it was instead an interpretive rule, additional policy considerations were not relevant, so the agency's failure to consider them was not arbitrary and capricious.

\* \* \*

Notice and comment rulemaking is a central part of the administrative framework set forth in the APA and the Clean Air Act. When an agency issues a legislative rule by exercising its delegated authority to establish new obligations with the force of law, it must follow these procedures. In the 2018 Guidance, however, EPA simply interpreted the immediate and necessary consequences of our decision in *Mexichem* and left rewriting the regulatory framework for future notice and comment rulemaking. Because the 2018 Guidance advised the public of the EPA's interpretation of legal obligations created by this court, it was an interpretive rule properly issued without notice and comment procedures. I respectfully dissent.